SANFORD AND RITA HORNWOOD, APPELLANTS/CROSS-RESPONDENTS, v. SMITH'S FOOD KING NO. 1 AND SMITH MANAGEMENT CORPORATION, RESPONDENTS/CROSS-APPELLANTS.

No. 18980

April 25, 1989                    772 P.2d 1284

[Rehearing denied June 23, 1989]

*Marquis, Haney & Aurbach,* Las Vegas, for Appellants/Cross-Respondents.

*Jolley, Urga, Wirth & Woodbury,* Las Vegas, for Respondents/Cross-Appellants.

*Thorndal, Backus, Maupin & Armstrong,* Las Vegas, for Amicus Curiae.

## OPINION

*Per Curiam:*

On June 2, 1975, Smith's Food King No. 1 (Smith's) entered

into a thirty year lease of shopping center property owned by Sanford and Rita Hornwoods' (Hornwoods) predecessor in interest.[1] Smith's leased approximately 28,000 square feet of space at 27 cents per square foot. The lease called for approximately $92,398 minimum annual rent and approximately 2.7 million dollars in total rent over the thirty year span of the lease. In addition, the agreement required Smith's to pay "percentage rent" calculated at 1.5 percent of sales generated by Smith's during the previous calendar year, less the aggregate amount of minimum rent paid during that calendar year. Smith's paid percentage rent for 1979 and 1980, but has not paid percentage rent since 1980 due to insufficient sales volume.

On November 1, 1986, Smith's closed its business at the leased premises and ceased its retail grocery operations. The closure occurred without any prior notice to the Hornwoods. The Hornwoods allege that Smith's closed its store at the leased premises because a new Smith's, built a short distance away, directly competed with the store Smith's operated at the leased premises. However, Smith's alleges that it closed its store as a result of various market studies, lost profits, and increased competition. Smith's further claims that it failed to give notice of the closure to the Hornwoods due to company policy. The policy is allegedly a result of previous experience with diminished employee morale, pilfering, and other attendant problems when notice of closure is given.

Smith's retained possession of the demised premises and continued to pay minimum rent after closing the store. The Hornwoods took no action to evict Smith's, instead choosing to allow Smith's to retain the premises and locate suitable subtenants. In May 1987, Smith's subleased 18,128 square feet to HUB Distributing, Inc., d/b/a Millers Outpost. Smith's subleased the remaining 10,000 square feet to Video Tyme in early 1988.

On December 4, 1986, the Hornwoods filed a complaint against Smith's charging that Smith's breached its lease by ceasing operations and vacating the demised premises prior to the expiration of the lease. After trial, the district court held that Smith's breached an implied covenant of continuous operation by ceasing operations with approximately twenty years remaining on the thirty year lease. However, the district court held that, because Smith's has continued to pay minimum rent, the Hornwoods were not entitled to an award of compensatory damages for breach of lease.

Additionally, the district court refused to award damages to the Hornwoods on any of their consequential damages theories. The

[1]The Hornwoods purchased the shopping center and assumed the status of landlords under the assigned lease in 1979.

Hornwoods sought consequential damages based on the diminution in value of the shopping center, lost future percentage rents from Smith's and the other tenants of the shopping center, and lost rent and other expenses associated with the other tenants. The court ruled that all of the alleged consequential damages were unforeseeable as a matter of law.

Furthermore, the Hornwoods claimed tort damages, alleging that Smith's acted in bad faith by closing its store, thereby breaching the implied covenant of good faith and fair dealing. The district court refused to impose tort liability upon Smith's, ruling that Smith's did not breach its duty of good faith and fair dealing.

Finally, the district court concluded that Smith's was entitled to costs and attorney's fees as the prevailing party.

The district court found that the lease contained an implied covenant to continuously operate as a grocery store, citing First American Bank v. Safeway Stores, Inc., 729 P.2d 938 (Ariz. Ct.App. 1986). Furthermore, the district court found that Smith's breached the implied covenant of continuous operation by ceasing to operate its grocery store located at the demised premises.[2] However, the district court did not award the Hornwoods compensatory or consequential damages resulting from this breach. The Hornwoods do not contest the district court's ruling on compensatory damages. However, the Hornwoods argue that the diminution in value of the shopping center occurring when Smith's breached the lease is a recoverable consequential damage. We agree.

"Damages from a breach of contract should be such as may fairly and reasonably be considered as arising naturally, or were reasonably contemplated by both parties at the time they made the contract." Conner v. Southern Nevada Paving, 103 Nev. 353, 356, 741 P.2d 800, 801 (1987) (citation omitted). The Hornwoods argue that the diminution in value of the shopping center both arose naturally and foreseeably as a result of the termination of operations by Smith's.

The Hornwoods presented substantial evidence to support their argument. Mr. Maury Abrams, developer of the center, testified that anchor tenants, (i.e. Smith's) draw the largest amount of customers, attract other "satellite" tenants, and are necessary for long-term financing. Mr. Joe Abdenour, the leasing agent for the shopping center, testified that when an anchor tenant leaves, the rental value of the shopping center immediately decreases,

---

[2]We have considered respondents' claim that the trial court erred by finding an implied covenant of continuous operation in the lease. Respondents' contention is without merit.

thereby decreasing the overall value of the shopping center. Further, the Hornwoods presented evidence that Smith's attracted approximately 40,000 customers a month into the shopping center. On the other hand, the Hornwoods showed that Millers Outpost, a subtenant of Smith's, generated only 4,500 customers per month.[3] Additionally, Mr. K. Donald Dunn, a certified real estate appraiser, stated that the value of the center decreased by $1,425,000 during the year following the departure of Smith's.

The district court found that the shopping center decreased in value in excess of one million dollars after Smith's ceased operations. However, the court concluded that the diminution of property value to the shopping center as a result of the departure of Smith's was unforeseeable and not compensable as a matter of law. We disagree.

Smith's is a sophisticated business entity. Smith's knew that its presence as the anchor tenant had a critical impact on the shopping center's success. Without an anchor tenant, obtaining long-term financing and attracting satellite tenants is nearly impossible for a shopping center. Perhaps most importantly, the anchor tenant insures the financial viability of the center by providing the necessary volume of customer traffic to the shopping center. Therefore, we find that the district court clearly erred in concluding, as a matter of law, that the diminution in value of the Hornwoods' shopping center was unforeseeable. *Conner,* 103 Nev. at 356, 741 P.2d at 801. Accordingly, we reverse that portion of the district court's ruling and remand to the district court for an assessment of the Hornwoods' damages as a consequence of the loss of their anchor tenant.

The Hornwoods cite Washington Trust Bank v. Circle K Corp., 546 P.2d 1249 (Wash.Ct.App. 1976), as authority for the proper measure of damages for the district court to use on remand. In *Washington Trust,* the lessee (Circle K) entered into a lease with the expectation of modifying the demised premises for its own business purposes. However, when city officials told Circle K that certain changes would not be permitted, Circle K repudiated its lease. The Washington Court of Appeals held that, "[t]he measure of damages is the difference between the present worth of the property with the lease less the present worth of the

---

[3]The Hornwoods did not include Video Tyme, another subtenant of Smith's, in the customer traffic count because Video Tyme merely moved from another location within the same shopping center to the remaining portion of the space formerly occupied by Smith's.

property without the lease." *Id.* at 1252. In *Washington Trust,* the trial court awarded the plaintiff $12,500 which represented the difference in the value of the property with the lease ($41,000) and the value without the lease ($28,500). *Id.* On remand, we direct the district court to use the *Washington Trust* formula to determine the extent of consequential damages suffered by the Hornwoods.

As a necessary incident of reversal on the issue of consequential damages, we also reverse the district court's award of costs and attorney's fees to Smith's as the prevailing party. "A plaintiff may be considered the prevailing party for attorney's fee purposes if it succeeds on any significant issue in litigation which achieves some of the benefit is sought in bringing the suit." Women's Federal S & L Ass'n. v. Nevada Nat. Bank, 623 F.Supp. 469, 470 (D.Nev. 1985) (citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)). Because we find that the Hornwoods suffered consequential damages in the form of diminution of property value due to the breach by Smith's, the Hornwoods have achieved a benefit in bringing this suit. Therefore, as the prevailing party, the Hornwoods are entitled to costs and attorney's fees pursuant to the lease. Upon remand, we direct the district court to award the Hornwoods reasonable costs and attorney's fees.

We have carefully considered appellant's other contentions and find them to be without merit.