**John D. KRUKEMEIER, Individually and as Shareholder of Krukemeier Machine & Tool Co., Inc. On Behalf of Such Corporation, Plaintiff–Appellant,**

v.

**KRUKEMEIER MACHINE & TOOL CO., INC., Thomas H. Krukemeier and Jeffrey J. Krukemeier, Defendants–Appellees.**

No. 30A01–8906–CV–198.

Court of Appeals of Indiana, First District.

March 22, 1990.

Gustin J. Raikos, Indianapolis, Robert G. Bogigian, Greenfield, for plaintiff-appellant.

F. Keith Leach, Noblesville, Brian K. Burke, Brent D. Taylor, Baker & Daniels, Indianapolis, James L. Brand, Brand & Allen, Greenfield, for defendants-appellees.

BAKER, Judge.

## STATEMENT OF THE CASE

Plaintiff-appellant, John D. Krukemeier (John), individually and as shareholder on behalf of Krukemeier Machine & Tool Co., Inc., appeals the trial court's judgment in favor of defendant-appellees, Krukemeier Machine & Tool Co., Inc. (the Company), Thomas H. Krukemeier (Tom), and Jeffrey J. Krukemeier (Jeff). We affirm.

## STATEMENT OF THE FACTS

John, Tom, and Jeff are brothers. The Company is a tool and die business incorporated by their father in 1960. In 1977, the father sold each of the brothers 34 shares in the Company, giving them each one-third ownership rights. For federal income tax purposes, the Company has continuously operated under a subchapter S election since the brothers purchased it.

Prior to 1977, Tom worked at the Company for his father and has continued to work there as President and General Manager since the brothers' purchase. He works full time for the Company, approximately 60 hours per week. Jeff, the Company's Vice–President and Secretary, is principally responsible for sales and devotes approximately 50 hours per week to his job. Jeff did not work for the Company for three years during the early 1980's, but has otherwise been continuously employed there since 1977. Both Tom and Jeff are also Directors of the Company. John has never worked for the Company, even during a one and one-half year period of unemployment. He was, however, a Director and the Company's Secretary/Treasurer from 1977 until 1986.

In March of 1981, the brothers signed a repurchase agreement (Agreement) which provides for the shareholders' disposition of Company stock at book value during their life and at their death. The enforceability of the Agreement is an important issue in the case, and we will analyze relevant provisions in our discussion below.

After the fiscal year ending February 28, 1986, Tom and Jeff determined they were being undercompensated and began collect-

ing salaries approximately three times greater than they had in the immediately preceding years. This decision and the events flowing from it are the nexus of the rupture between Tom and Jeff on one hand and John on the other. On April 7, 1986, Tom offered to purchase John's shares for $300,000, a price well in excess of that called for in the Agreement, which was approximately $150,000 at that time. The offer, however, included a $129,000 dividend distribution to John, reducing the net purchase price to $171,000. John refused. On April 14, 1986, Tom increased his offer to $380,000. After consulting with an accountant, John determined the fair market value of his shares was $600,000 and made a counteroffer to Tom for that price on April 18, 1986. Tom rejected the counteroffer.

At the next Director's meeting on September 8, 1986, Tom and Jeff voted against John in elections for the following year's Director and officer positions. Tom assumed the Treasurer's role and Jeff became Secretary. Since the meeting John has no day to day voice in the Company, but continues to receive one-third of all dividends.

John filed suit, individually and derivatively, against the Company, Tom, and Jeff for a return of excess compensation, damages for lost dividends, repurchase of his stock, appointment of a receiver, and declaration of a constructive trust. Tom and Jeff filed a counterclaim for specific performance of the Agreement.

The trial court denied Tom and Jeff's counterclaim, but nonetheless ordered specific performance, denying any other relief to John. John appeals.

## ISSUES

John raises several issues which we restate as follows:

I. Whether John was required to prove that Tom's and Jeff's compensation was excessive.

II. Whether the trial court applied the appropriate standard in analyzing Tom's and Jeff's setting of compensation and dividends.

III. Whether the trial court properly ordered specific performance of the Agreement.

## DISCUSSION AND DECISION

■ At the outset, we note our standard of review. The trial court made specific findings of fact pursuant to Ind.Trial Rule 52(A), but made no general finding. Accordingly, to affirm we must determine the specific findings are adequate to support the judgment. *Matter of Dull* (1988), Ind. App., 521 N.E.2d 972; *Shrum v. Dalton* (1982), Ind.App., 442 N.E.2d 366.

### I.

■ John bases his first argument on the fiduciary relationship existing between majority and minority shareholders in a close corporation. *Cole Real Estate Corp. v. Peoples' Bank & Trust Co.* (1974), 160 Ind.App. 88, 310 N.E.2d 275. In the context of this fiduciary relationship, he asserts a minority suit alleging self-dealing by the majority in setting its own compensation places the burden of proof on the majority to show the compensation was reasonable and fair to minority interests.

John relies on *Dotlich v. Dotlich* (1985), Ind.App., 475 N.E.2d 331, *trans. denied,* and several cases from foreign jurisdictions. *Dotlich* and its cited precedent, *Lucas v. Frazee* (1984), Ind.App., 471 N.E.2d 1163, involved issues of real property conveyances. *Dotlich* involved a director of a close corporation who retained title to real property ultimately belonging to the corporation. In that case, this court required the defendant director to show his actions were honest and in good faith. *Dotlich, supra,* at 342.

On the issue of compensation, however, *Cole Real Estate, supra,* is controlling. "Once a corporate officer's compensation is challenged, the burden of establishing unreasonable compensation lies with the minority shareholder instituting the action." *Id.* 160 Ind.App. at 96, 310 N.E.2d at 280. The trial court properly allocated the bur-

den of proof to John.[1]

## II.

Closely related to the issue of which party bears the burden of proof is the issue of the standard of proof the party bearing the burden must meet. John argues the trial court erred in applying the business judgment rule to Tom and Jeff's conduct regarding salaries and dividends. The trial court did not apply the business judgment rule as codified in IND.CODE 23–1–35–1. Rather, it applied binding Indiana precedent to determine the propriety of the questioned conduct.

■ John argues the Company is an "incorporated partnership" for which the "rigorous fiduciary rule of partners" is the standard of proof. This argument amounts to nothing more than a restatement of the rule that shareholders in a close corporation, standing in a fiduciary relationship to one another, must deal openly, honestly, and fairly with the corporation and each other. *Garbe v. Excel Mold, Inc.* (1979), Ind.App., 397 N.E.2d 296. The idea of the "incorporated partnership" is recognized in Indiana. *Hartung v. Architects Hartung/Odle/Burke, Inc.* (1973), 157 Ind. App. 546, 301 N.E.2d 240. The phrase "incorporated partnership," however, does not refer to the standard of proof required in a compensation case. Rather, it is merely an abbreviated manner of stating what we have already observed; namely, that shareholders in a close corporation all owe a fiduciary duty to one another. The standard of proof in compensation cases requires a plaintiff shareholder to show the compensation is unjust, oppressive, or fraudulent. *Green v. Felton* (1908), 42 Ind.App. 675, 688, 84 N.E. 166, 170. John has failed to prove any of these elements. He argues merely that the reduction in dividend payments to him engendered by Tom and Jeff's increased salaries amounts to an illegal freeze-out.[2]

■ Expert evidence at trial revealed Tom and Jeff were undercompensated before 1986. Moreover, the same evidence showed the increase in their salaries after that time was reasonable and a reflection of their success in making the Company a uniquely profitable enterprise. The compensation was not unjust. Nor was it oppressive. In the year ending December 31, 1987, despite the increased compensation to Tom and Jeff, total dividends were more than three times greater than in the preceding year.[3] John, an equal one-third shareholder entitled to dividend distributions, has not been oppressed. Finally, John has shown no fraud. The trial court found the compensation to Tom and Jeff was made after Board of Directors' authorization with written minutes available for John's inspection. Moreover, the court found the Company adhered to corporate norms and maintained an identity separate from that of its majority shareholders. *Record* at 570.

The fact that John's dividends have decreased is not tantamount to a showing of unjust, oppressive, or fraudulent conduct.

---

1. There is no general agreement as to which party bears the burden of proof when a minority shareholder challenges the reasonableness of compensation. *See* 1 F.H. O'Neal & R. Thompson, *O'Neal's Oppression of Minority Shareholders* § 3:08 (2nd ed. 1985) and *Bermann v. Meth* (1969), 436 Pa. 88, 258 A.2d 521, 522.

   Other states allocating the burden of proof to the plaintiff minority shareholder include Florida and Illinois. *See e.g. Coleman v. Plantation Golf Club, Inc.* (1968), Fla.App., 212 So.2d 806 and *Jaffe Commercial Finance Co. v. Harris* (1983), 119 Ill.App.3d 136, 74 Ill.Dec. 722, 456 N.E.2d 224.

2. John argues the reduction in dividends and the concomitant salary and bonus increases are breaches of fiduciary duty which are ultra vires and void. They are neither. Properly, an ultra vires act is one outside the scope of a corporation's legislatively conferred powers, and "[t]he doctrine of ultra vires will not be invoked by a court as an excuse for substituting its judgment in [a] matter for that of ... directors and officers." *Huntington Brewing Co. v. McGrew* (1916), 64 Ind.App. 273, 282, 112 N.E. 534, 537. Moreover, as we discuss above, John has failed to show any breach of fiduciary duty by Tom or Jeff.

3. The Company operates on a fiscal year calendar from March 1 to February 28. Accordingly, the December 1987 dividend figure represents dividends distributed over a ten-month period only while the compared dividend figure represents a full fiscal year.

The trial court properly found the compensation reasonable.

### III.

John next argues the trial court erred in ordering specific performance of the Agreement. The Agreement gives remaining shareholders a right of first refusal when any shareholder desires to sell his stock. The refusal right is triggered when the retiring shareholder gives written notice to the other share holders of his desire to sell. It also requires the remaining shareholders to purchase their pro rata share of a deceased shareholder's stock. Article 4a of the Agreement states that the parties, prior to signing the Agreement, purchased life insurance on each of their lives to facilitate the immediate availability of cash for post-mortem transfer. Article 4b recites the parties' agreement to maintain the life insurance policies for the duration of the Agreement. All three brothers allowed their insurance policies to lapse.

■ John makes two arguments here. First, he argues the provisions of Article 4b create a condition precedent that the life insurance be maintained for the Agreement to be binding. They do not. A condition precedent must be fulfilled before the duty to perform an existing contract arises. *THQ Venture v. SW, Inc.* (1983), Ind.App., 444 N.E.2d 335, 339. Conditions precedent are disfavored and must be stated explicitly. *See* 17A C.J.S. *Contracts* § 338 (1963). Here, the life insurance serves "to assure that all or a substantial part of the purchase price for the shares of stock of a deceased shareholder will be available immediately in cash upon his death." This language is merely a recitation of purpose.

4. The parties' failure to maintain life insurance may be a breach, but if so, it is an insignificant breach. All the parties are alive and none can claim damages from the lapse of the coverage.

5. Article 8 of the Agreement allows for the sale of shares "in any lawful manner." *Record* at 1809. This includes a sale to the Company, which is what the trial court ordered, rather than a sale to the individual shareholders.

6. John argues the trial court made inconsistent findings and conclusions necessitating reversal.

Moreover, the Agreement states "[s]o long as this Agreement is in effect, the owner of each policy agrees that he will maintain [life] insurance in force." *Record* at 1808. This clause is the antithesis of a condition precedent. It has no express language making the duty to abide by the Agreement conditional. Indeed, it almost makes maintaining the Agreement a condition precedent to maintenance of life insurance coverage.[4]

■ Second, John argues he has not consented to the sale of his stock under the Agreement. John's prayer for relief in Count III of his complaint requested the trial court to order the Company to repurchase his stock at a fair and equitable value, taking current and retained earnings into account. In addition to its specific prayer, Count III contains a general prayer for equitable relief. The Agreement calls for sale at book value, which excludes earnings. The trial court ordered the sale pursuant to the Agreement.[5] Simply put, John sought equitable relief and he received it. It is well settled in Indiana that a trial court sitting in equity has the authority to mold its decree to meet the case in the record when the plaintiff's complaint contains a general prayer as well as a specific prayer for relief. *Lynch v. Keck* (1970), 147 Ind.App. 570, 579, 263 N.E.2d 176, 181. We are satisfied the trial court's findings are adequate to support its order of specific performance of the Agreement, and John cannot complain to this court that he is dissatisfied with the equitable relief which his general prayer requested.[6] Moreover, there are cogent policy reasons to allow a trial court to order specific performance of contracts for the repurchase of a close corporation's stock.

The trial court denied Tom and Jeff's counterclaim for specific performance because John's complaint did not constitute the Agreement's required written notice of his desire to sell his stock. At the same time, the court ordered specific performance of the Agreement because John consented to a sale at "fair and equitable value" by virtue of Count III of his complaint. Because Count III contains a general as well as a specific prayer for relief, the rule in *Lynch, supra,* controls and the trial court's order is proper.

Close corporations generally find no market for their shares. The only people interested in the business are the "incorporated partners" who are intimately involved with the entity. Because there is no market, it is difficult and speculative to value a close corporation's shares. Accordingly, repurchase agreements often call for sale at book value, determined per share by dividing the corporation's net worth as shown on the corporate books by the number of shares outstanding. F.H. O'Neal & R. Thompson *O'Neal's Close Corporations* § 730 n. 1 (3rd ed. 1987). This valuation method has been criticized for not taking into account the worth of a going business, F.H. O'Neal & R. Thompson *O'Neal's Close Corporations* § 730 (3rd ed. 1987), but it is for the parties, not the court, to establish a valuation method in a purchase agreement.[7] Here, the Agreement provides for sale at book value, and we will not rewrite the contract.

Were we to deny the availability of specific performance in these cases, two evils would result. First, majority shareholders could try to freeze out minority shareholders by refusing to purchase shares at the contract price. Second, minority shareholders like John could petition the courts with speculative demands for inflated resale prices. The trial court properly ordered the sale of John's stock to the Company pursuant to the Agreement.

Judgment affirmed.

RATLIFF, C.J., and CHEZEM, P.J., concur.

---

**7.** If the parties to a purchase agreement desire to use a valuation method other than book value, they are of course free to do so. Our holding today is simply that contracts for the repurchase of a close corporation's outstanding stock are proper subjects for specific performance.

This rule comports with holdings in several other jurisdictions. *See e.g. Brown v. Knox* (1985), 219 Neb. 189, 361 N.W.2d 540; *Matter of Fontana D'Oro Foods, Inc.* (1985), 65 N.Y.2d 886, 493 N.Y.S.2d 300, 482 N.E.2d 1216, *Brand v. Lowther* (1981), 168 W.Va. 726, 285 S.E.2d 474.