**SCOTT–REITZ LTD., an Indiana Corporation, Appellant–Substituted Defendant,**

**and**

**Scott's Food Stores, Inc., Appellant–Defendant,**

**v.**

**REIN WARSAW ASSOCIATES, an Indiana Limited Partnership, Appellee–Plaintiff.**

**No. 43A03–9403–CV–92.**

Court of Appeals of Indiana.

Nov. 27, 1995.

Arthur P. Kalleres, Michael A. Wilkins, Ice Miller Donadio & Ryan, Indianapolis, M. Bruce Scott, DeVoss, Scott, Johnson & Baker, P.C., Decatur, for appellant.

Daniel K. Leininger, Lemon, Armey, Hearn & Leininger, Warsaw, Bernard L. Pylitt, Jeffrey A. Hearn, Katzman Katzman & Pylitt, P.C., Indianapolis, for appellee.

## OPINION

HOFFMAN, Judge.

■ Appellant-defendant Scott–Reitz Ltd. (Scott) appeals from a judgment in favor of appellee-plaintiff Rein Warsaw Associates (Rein)[1] in a breach of lease action.

In May of 1988, Rein purchased a shopping center in Warsaw, Indiana, known as Marketplace of Warsaw (Marketplace), along with an adjoining parcel of vacant land, and began negotiations with Scott for the lease of a retail grocery store which was to be built as part of an addition to the Marketplace.

On July 26, 1988, a letter of intent was executed by William G. Reitz, Scott's president. According to the letter, the Horizon Group, Rein's predecessor in interest, as lessor, was to construct a 57,000 square foot building which was to be used as a grocery store, while Scott, as tenant, agreed to finish the building by installing the necessary trade fixtures and equipment. The letter also provided that a satisfactory lease agreement was to be executed within 60 days. During the negotiations of the lease, Horizon Group sold its interest in the Marketplace to Rein.

Despite the previous 60–day time limit in the letter, the lease agreement ("Lease") between Rein and Scott was not executed by the parties until February 2, 1990. Sections 3.1(a) and (e) of the Lease required Rein to obtain the permits necessary for construction to begin. The Lease between the parties also required Rein to construct the store in accordance with plans and specifications that the parties were to cooperate in drafting (hereinafter referred to as the "Plan"). Although Rein was responsible for developing the over all Plan, it was not required to present the Plan until Scott furnished details as to the store fixture plan, pit and drain plan, general plumbing and electrical plan and refrigeration requirements. Within 30 days after Scott provided these details to Rein, Rein was to present the Plan.

After execution of the Lease, Scott became concerned about the start-up costs it faced for the Warsaw store which was the subject of the Lease with Rein and for another store which was to open in Kendallville, Indiana. At Scott's February 14, 1990 board meeting, the members of the board discussed slowing down both projects and postponing their openings until 1991. Meanwhile, Rein experienced problems obtaining the necessary wetlands permits for the construction of the store. Scott knew that the poor soil conditions at the Marketplace would necessitate pilings be used for the foundation work and would add to the construction costs for the store; however, Scott was unaware the site was "jurisdictional wetland soil."

---

1. Rein is directed to Ind.Appellate Rule 8.2(A)(2) regarding page margins. Attempts to circumvent the 50–page limit rule by extending page margin to the ends of the pages are not an appropriate form of appellate brief writing. Should counsel need more space to present the issues for review, then he or she is advised to file a motion with this Court asking permission to exceed the 50–page limit rule.

As early as March of 1989, Rein's attorneys and engineers began gathering the data necessary to apply to the U.S. Army Corp of Engineers for a Section 404 permit and a Section 401 Water Qualification Permit from the Indiana Department of Environmental Management. The Army Corp advised Rein it would have to mitigate the loss of wetlands before a permit would be issued. Rein began negotiations with the owner of real estate adjacent to the Marketplace, Batalis, for the purchase of the property. However, it was discovered that the Batalis' property was not suitable for mitigation as it was already an existing wetlands. Thus, Rein's initial state and federal permits were denied without prejudice. Thereafter, Rein obtained Jimmy New, an environmental consultant, to develop a suitable mitigation plan. New began corresponding with the agencies involved. The Indiana Department of Natural Resources (IDNR) suggested to New that farmland owned by Robert Lozier was suitable mitigation property, which IDNR desired to add to its wetlands holdings. In late September or early October 1990, Lozier agreed to sell his land to Rein.

In the late summer of 1990, during approximately the same time frame New confirmed the appropriateness of the Lozier property, Rein approached Jim Orn, of Scott, regarding the possibility of Scott instead moving into the Big Wheel Store, which was approximately the same size as required by Scott for the operation of its grocery store. Orn informed Scott's president, William Reitz, and the chairman of the board, Donald Scott, of this development. After inspecting the Big Wheel Store, Reitz and Scott encouraged Orn to look at the Big Wheel Store to see if it was possible to convert it into a Scott's grocery store. Sometime between the summer and early November of 1990, Orn inspected the Big Wheel Store and found the building to be of good construction and decided that the conversion would be possible. From late summer of 1990 through January 18, 1991, Scott engaged in a course of conduct evidencing the parties' interest in converting the Big Wheel Store into Scott's Warsaw grocery store in lieu of constructing a new store as called for in the Lease. On January 18, 1991, Scott and Big Wheel Store representatives met in Fort Wayne, Indiana to discuss construction details for the conversion of the Big Wheel Store. On the same day, Rein received notice from Scott that it repudiated the Lease.

On June 28, 1991, Rein filed this action against Scott for breach of the Lease. After a bench trial, the court entered judgment in favor of Rein and awarded Rein $1,610,000.00 in damages. Scott now appeals.

Scott raises two issues which are restated for review:

(1) whether sufficient evidence exists to support the trial court's determination that Scott breached the lease agreement; and

(2) whether the damage award is within the scope of the evidence.

As requested by Rein, the trial court entered findings of fact and conclusions of law pursuant to Ind.Trial Rule 52(A). When findings of fact and conclusions of law are requested by a party, this Court first determines whether the evidence supports the trial court's findings and second, whether the findings support the judgment. *Bauer v. Harris* (1993), Ind.App., 617 N.E.2d 923, 926. The judgment of the trial court will be reversed only if clearly erroneous. *Id.*

On appeal, the findings or judgment of the trial court will be reversed only when this Court is left with the definite and firm conviction that a mistake has been committed. *Roark v. Roark* (1990), Ind.App., 551 N.E.2d 865, 869. In determining whether the trial court's findings are clearly erroneous, this Court neither will reweigh the evidence nor determine the credibility of the witnesses and will consider only the evidence which supports the judgment and the reasonable inferences therefrom. *Tomahawk Village Apartments v. Farren* (1991), Ind.App., 571 N.E.2d 1286, 1291. It is the province of the trial court to determine which witnesses to believe when it hears the evidence. This Court cannot reverse upon the basis of conflicting evidence. *Endsley v. Game–Show Placements, Ltd.* (1980), Ind.App., 401 N.E.2d 768, 771.

A lease is construed in the same manner as any other contract. *Whiteco Industries, Inc. v. Nickolick* (1991), Ind.App., 571 N.E.2d 1337, 1339, *trans. denied.* This Court will give effect to the parties' intent as shown by their written expression in the lease. *Edward Rose of Indiana v. Fountain* (1982), Ind.App., 431 N.E.2d 543, 546. The lease will be read as a whole to ascertain its intended meaning, and in so doing, this Court gives the words of the lease their ordinary and common meaning unless a different meaning is clear from the lease's subject matter. *Ogilvie v. Steele by Steele* (1983), Ind.App., 452 N.E.2d 167, 170.

Scott contends that Rein was not entitled to recover for breach of the Lease because it failed to comply with certain conditions precedent of the contract. A condition precedent must be fulfilled before the duty to perform an existing contract arises. *Krukemeier v. Krukemeier Mach. & Tool* (1990), Ind.App., 551 N.E.2d 885, 889. Such conditions are disfavored and must be stated explicitly within the contract. *Id.*

Relying on subsections 3.1(a), (e) and (f), Scott asserts no obligation existed under the Lease until Rein obtained the necessary building permits, constructed the building, and tendered possession. Section 3.1 subsection (a) of the Lease states Rein shall construct a building that is in substantial accordance with the plans and specifications; subsection (e) sets forth, in part, the work to be done by Rein; and subsection (f) provides that Rein shall obtain the necessary permits for construction and shall begin construction within a reasonable time after their issuance. No language exists within these subsections which suggests that construction of the building is a condition precedent to the Lease. Rather, the construction is an integral part of the Lease, itself. Additionally, as Rein points out, Section 3.1(e)(I) of the Lease imposes upon Scott a duty to provide Rein with the tenant details prior to any obligation by Rein to develop the overall Plan and otherwise start the necessary steps leading to construction. Thus, both parties were obligated by the Lease upon its execution, even prior to the actual construction of the store.

Scott also argues Rein was not only unable to perform under the terms of the Lease, but also Rein was in material breach of the Lease prior to its repudiation and is therefore precluded from recovering damages. Scott contends the trial court's Finding No. 32 is not supported by sufficient evidence. Finding No. 32 provides:

"32. On January 18, 1991, when Defendant [Scott] repudiated and breached the Lease Agreement, Plaintiff [Rein] was ready, willing and able to resume its activities in preparing for the construction of the 'New Warsaw Store' called for in the Lease Agreement and could have performed all obligations required of Plaintiff in the Lease Agreement, including, but not limited to, the construction of the 'New Warsaw Store.' "

On January 18, 1991, Scott sent a letter to Rein which repudiated the Lease on the grounds that Rein itself had defaulted under the Lease by not delivering possession of the building within a reasonable time. Section 14.4(a) of the Lease states:

"If any default of the Landlord [Rein] hereunder shall continue uncorrected for thirty (30) days after notice thereof from the Tenant [Scott] to the Landlord, this Lease may be terminated by the Tenant at any time thereafter during the continuance of such default by giving written notice of termination to the Landlord. If any alleged default is of such a nature that it cannot be completely remedied or cured within the thirty (30) day period above provided, then notwithstanding the provisions of this Section to the contrary, Tenant shall not have a right to enforce any of the remedies herein set forth if Landlord shall proceed with due diligence and in good faith to complete the curing thereof."

Thus, even if there had been an unreasonable delay caused by Rein, Scott could not unilaterally terminate the Lease without first providing Rein 30 days' notice and an opportunity to cure.

Notwithstanding the existence of the express provision within the Lease, the common law dictates the same result. When one party repudiates the contract, the injured party has the option of pursuing one of

three remedies: 1) he may treat the contract as rescinded and recover upon quantum meruit; 2) he may keep the contract alive for the benefit of both parties, being at all time ready and able to perform, and at the end of the time specified in the contract for performance, sue to recover under the contract; or 3) he may treat the repudiation as putting an end to the contract and sue to recover the damages caused by refusing to carry out the contract. *Indianapolis v. Twin Lakes Enterprises* (1991), Ind.App., 568 N.E.2d 1073, 1080, *trans. denied*; *Federal Life Ins. Co. v. Maxam* (1917), 70 Ind.App. 266, 278–279, 117 N.E. 801, 804. When the injured party treats the other's breach or repudiation as putting an end to the contract for all purposes of performance, the injured party is not bound to give further notice of its election before a suit is brought and is not bound to show it has been ready, willing and able to perform its part of the repudiated contract. *Twin Lakes,* 568 N.E.2d at 1080. If the injured party was not at fault at the time of the repudiation and was adhering to contract when repudiated by the other party, it has discharged its obligations. *Id.*

Further, when a party deviates from strict performance called for by the contract, the former cannot suddenly declare the deviation a breach of contract. *See Pierce v. Yochum* (1975), 164 Ind.App. 443, 457, 330 N.E.2d 102, 112, *trans. denied.* Notice must be given to the other party that strict performance will be required in the future, then if the party continues to deviate, a default can be declared. *Id.* Similarly, when both parties to a contract acquiesce to a delay, neither side can suddenly declare the contract rescinded and simply walk away. Notice must be given to the other party along with an opportunity to perform within a reasonable time. *Keliher v. Cure* (1989), Ind.App., 534 N.E.2d 1133, 1137.

Shortly after executing the Lease, Scott became concerned with the start up costs it faced with the possible simultaneous construction of the Kendallville and Warsaw stores and desired to postpone the opening of both stores until 1991. Thereafter, Scott withheld the tenant details necessary to begin construction of the store. Without Scott's tenant details as described in Section 3.1(e)(I) of the Lease, Rein's architects were unable to prepare the Plan which was a necessary step prior to construction of the actual building. Then in 1990, Scott expressed its interest in converting the Big Wheel Store, in lieu of constructing a new building. Scott's participation in the Big Wheel Store conversion project through January 18, 1991, continued to promote the delay in constructing the grocery store as described in the Lease. Additionally, there is evidence that in November of 1990, prior to the breach of the Lease, Scott had entered into sales negotiations with Super Valu Stores, Inc. which already had two grocery stores in the Warsaw area. Thus, it can be inferred that Scott decided that it was not in its best interest to lease a store in Warsaw. Scott could not willingly participate in a delay of performance and then declare the Lease rescinded because of delay; reasonable notice had to be given to Rein, along with an opportunity to perform within a reasonable time. *See Maddox v. Wright* (1986), Ind.App., 489 N.E.2d 133, 137 (where the actions or conduct of one party to a contract prevent the other from performing his part, the other's nonperformance will be excused); *see also Kokomo Veterans, Inc. v. Schick* (1982), Ind.App., 439 N.E.2d 639, 645, *trans. denied* (party may not rely on failure of condition precedent to excuse performance where the party's own action or inaction caused the condition to be unfulfilled).

Scott also asserts that Rein's failure to disclose the property was wetlands or to disclose that the initial permits had been denied constitutes a material breach of contract by Rein. There are no provisions within the Lease which required Rein to inform Scott of its progress in obtaining the necessary permits, nor did Rein assume any responsibility to inform Scott of the site conditions. *Compare Twin Lakes,* 568 N.E.2d at 1076–1077 (City which contracted with Twin Lakes to dredge a reservoir assumed responsibility to inform Twin Lakes of known site conditions).

At the time the Lease was executed, Rein had no reason to believe the permitting process would create an undue delay. At trial,

there was evidence presented that Rein did not discover the Batalis property was not suitable mitigation property until the end of May 1990. Prior to the denial of the wetlands permit without prejudice, Rein hired New to rectify the situation. IDNR informed New that ideally it would like to have the Loizer property in mitigation. There is further evidence that as of November 15, 1990, Lozier had agreed to sell his property to Rein. Further, New stated that in late October 1990, it was his opinion, based on a 100% success rate, Rein's prospects for obtaining the necessary permits were excellent. Thus, Rein had been ready, willing and able to purchase suitable mitigation property. Scott merely requests this Court to reweigh the evidence, which it will not do. *See Am. Ind. Management Systems v. McDaniel* (1982), Ind.App., 443 N.E.2d 98, 100. The evidence is sufficient to support the trial court's findings of fact.

■ Scott also suggests that its January 18, 1991 termination letter should be construed as a 30–day notice under section 14.4 of the Lease. Not only did Scott fail to raise this argument at trial, Scott's president, Reitz, testified at trial that Scott never sent Rein a 30–day notice of default.

■ Finally, Scott challenges the trial court's award of damages. Specifically, Scott argues that the award was unsupported by the evidence.

■ An award of damages is a matter for the discretion of the trial court and will be upheld as long as supported by the evidence. *Ind. U. v. Indiana Bonding & Sur.* (1981), Ind.App., 416 N.E.2d 1275, 1288, *trans. denied.* A party injured by a breach of contract may recover consequential damages. *Clark's Pork Farms v. Sand Livestock Sys.* (1990), Ind.App., 563 N.E.2d 1292, 1298. Such damages included those that may reasonably be considered to have arisen naturally from the breach or those that may reasonably have been in contemplation of the parties as a probable result of the breach at the time the contract was entered. *Id.* Although an award of damages may not be based on conjecture or speculation, this Court does not require any particular degree of mathematical certainty. *Farm Bureau Mut. Ins. Co. v. Dercach* (1983), Ind.App., 450 N.E.2d 537, 540–541, *trans. denied.* Any measure of damages must be flexible enough to vary with the necessity of the situation. *Ind. Tri–City Plaza Bowl v. Estate of Glueck* (1981), Ind.App., 422 N.E.2d 670, 678, *trans. denied.*

At trial, Lowell Griffin, a certified general appraiser, testified as to the fair market value of the Marketplace with and without Scott's Lease, taking into account the market factors that existed on January 18, 1990, the date of the breach. In reaching his determination, Griffin considered three valuation methods: cost approach, sales comparison approach, and income capitalization approach. All three have been approved by this Court as a method of determining a property's fair market value. *See Annon II, Inc. v. Rill* (1992), Ind.App., 597 N.E.2d 320, 326–327, *trans. dismissed.* After determining the cost approach would be unreflective of the amount of damages, Griffin used only the sales comparison and income capitalization approaches. In reaching a value, Griffin measured the difference between the worth of the Marketplace with the Scott Lease and a drug store lease agreement on January 18, 1991, less the value of the Marketplace without the Lease and the drug store lease, less the cost of construction not expended by Rein for a value of $1,480,000.00 in damages. Griffin then compared this amount with the price of similar shopping centers in the region, under the sales comparison approach.

The trial court in entering judgment for Rein found damages in the amount of $1,480,000.00, the diminished value of the Marketplace without the Lease, plus cost, expenses and reasonable attorney's fees incurred as provided in the Lease for a total award of $1,610,000.00 in damages. In reaching its determination, the trial court entered Finding of Fact No. 7:

"7. At the time Plaintiff [Rein] and Defendant [Scott] executed the Lease Agreement, it was fairly and reasonably foreseeable to both parties that, should Defendant breach the Lease Agreement by refusing to perform the lease and not opening and/or continuously operating its grocery

store through the term of the lease, Plaintiff would suffer consequential damages, including diminution in value of the shopping center [Marketplace] because: other tenants would no longer be attracted to the shopping center resulting in both lost rental opportunity for Plaintiff; existing tenants' businesses would become less profitable due to the decrease in customer traffic and cause these tenants to either leave the center or negotiate leases for less rent or otherwise having less favorable financial terms to Plaintiff; and without a strong anchor tenant Plaintiff's ability to gain financing for the shopping center would be diminished or otherwise harmed."

Although the Lease did not specifically list Scott as an anchor tenant, there was evidence from which to support the trial court's finding. The Lease was for a long term, 20 years; whereas, the B tenants' leases[2] were for relatively short terms. The Lease also contained a continuous use clause which required Scott to operate a grocery store under its name for the term of the Lease. Reitz recognized that a grocery store is a good attraction for a shopping center. Moppet, Scott's expert witness, also acknowledged that Scott was considered an anchor tenant in certain shopping centers in which its stores were located, although he stated that Scott would be "just another store" at the Marketplace. Griffin opined to the contrary. He stated that the Marketplace was the type of shopping center where Scott would be a critically strong anchor tenant. Griffin opined that the importance of Scott as an anchor tenant was attracting traffic to the Marketplace and having customers become accustomed to shopping there on a daily or weekly basis, thereby, increasing business to the B tenants. Further, Griffin's valuation took into consideration the fact that two of the other anchors, Big Wheel Store and Teepee, had closed and the economic conditions at the time of the breach.

The trial court resolved any conflict in the testimony as to Scott's status, as a tenant, against Scott. From the evidence, the trial court could have reasonably inferred that both Rein and Scott recognized the importance of Scott to the Marketplace as to its ability to draw in customers. *Cf. Hornwood v. Smith's Food King* (1989) 105 Nev. 188, 772 P.2d 1284 (first decision) and (1991) 107 Nev. 80, 807 P.2d 208 (second decision) (1992) 108 Nev. 666, 836 P.2d 1241 (third decision) (an implied covenant to continuously operate meant that the landlord's losses from B tenants caused by a breach of lease were foreseeable).

■ Scott argues the trial court's award contains anticipated lost future rental profit, from the B tenants, which is too speculative an amount to properly base an award of damages. Evidence of future profits was relevant, insofar as it applied to the value of the Lease on the date of the breach. Rein's evidence of future profits was relevant not as to anticipated lost profits as such, but rather as going to the fair market value of the Lease. *See Annon II* 597 N.E.2d at 326–328.

■ Scott also asserts the trial court erred in including the value of the Hook's lease into the award of damages. The plan for the development of the Marketplace included a drug store to accompany the grocery store. Scott's Lease specifically provided that Rein reserved the right to select a drug store tenant. In 1989, Rein began negotiating with Hook's. On March 14, 1989, Hook's signed a letter of intent outlining the general terms that would be incorporated into a lease. The letter stated Hook's interest was contingent upon Scott's opening a full service grocery store at the Marketplace. As late as February 4, 1991, Hook's advised Rein to keep Hook's advised of the progress with Scott. Thus, as of the date of the breach, Hook's was ready, willing, and able to lease space contingent upon Scott's location in the Marketplace. Scott's repudiation was the cause of Hook's not leasing space in the Marketplace. Hence, there was no error in including the Lease in the calculation of damages. The trial court's award of dam-

---

**2.** A "B tenant" is a smaller commercial retail operator that depends on traffic brought into a shopping center by the anchors for the volume of their business. B tenants typically have shorter leases and pay higher rents because they have smaller square footage and are less creditworthy than the anchor tenants.

ages was within the scope of the evidence. *See Ind. U.*, 416 N.E.2d at 1288. The judgment of the trial court is affirmed.

Affirmed.

STATON and RUCKER, JJ., concur.