T–3 MARTINSVILLE, LLC, and MS Martinsville, LLC, Appellants–Plaintiffs–Counterclaim Defendants/Cross–Appellees,

v.

US HOLDING, LLC, Hoosier Enterprises IX, Inc., and John W. Bartle, Appellees–Defendants–Counterclaimants/Cross–Appellants.

No. 55A01–0810–CV–462.

Court of Appeals of Indiana.

Oct. 30, 2009.

C. Daniel Motsinger, Libby Y. Mote, Krieg DeVault LLP, Indianapolis, IN, Attorneys for Appellants.

David F. McNamar, McNamar & Associates, P.C., Indianapolis, IN, Attorney for Appellees US Holding, LLC, and John W. Bartle.

Richard B. Kaufman, Doninger Tuohy & Bailey LLP, Indianapolis, IN, Attorney for Appellee Hoosier Enterprises IX, Inc.

## OPINION ON REHEARING

CRONE, Judge.

### Case Summary and Issues

T–3 Martinsville, LLC, and MS Martinsville, LLC ("Landlords"), brought an interlocutory appeal, challenging the trial court's rulings against them in its "Ruling on Motions for Summary Judgment" ("Ruling"). US Holding, LLC ("USH"), John W. Bartle, and Hoosier Enterprises IX, Inc. ("Hoosier") (collectively referred to as "Appellees"), cross-appealed the rulings against them in the aforementioned order. We affirmed the trial court. *See T–3 Martinsville, LLC v. US Holding LLC,* 911 N.E.2d 100 (Ind.Ct.App.2009). Landlords now petition for rehearing, raising four issues which we consolidate and restate as follows:

I. Whether this Court misstated the trial court's Ruling;

II. Whether our determination that Landlords are required to provide USH with notice of default and a reasonable opportunity to cure be-

fore terminating their lease is contrary to *Scott–Reitz Ltd. v. Rein Warsaw Associates*, 658 N.E.2d 98 (Ind.Ct.App.1995), and cases cited therein; and

III. Whether we must specify the requirements for notice of default and opportunity to cure.

We grant rehearing for the purpose of clarification and reaffirm our prior holding.

### Factual Summary

This case has its roots in the nonpayment of rent under a lease ("the Lease"), wherein USH, as lessee, agreed to lease the Grandview Convalescent Center ("Grandview") from Landlords. Landlords are owned by various members of the Turner family. Bartle served as guarantor under the Lease. USH subleased Grandview to Hoosier, which is owned by Stuart Reed.

From September 2006 to February 2008, USH did not pay rent to Landlords. However, the Turners owned a business in Batesville, Indiana, to which USH had advanced hundreds of thousands of dollars. From September 2006 to February 2008, members of the Turner family held periodic discussions and meetings with Bartle and Reed. One of the topics of discussion was a possible setoff of the amounts due and owing at Batesville with the amounts due and owing under the Lease. Reed specifically indicated to the Turners that he was willing to step in and pay the rent owed under the Lease.

In February 2008, Landlords filed their complaint for ejectment and immediate possession of Grandview, which initiated these proceedings. The trial court issued a ruling on Landlords' motion for immediate possession ("the Prejudgment Possession Ruling"), which required USH or Hoosier to pay Landlords the delinquent rent or lose possession of Grandview.

Hoosier paid Landlord in compliance with the Prejudgment Possession Ruling.

Subsequently, Hoosier filed numerous counterclaims against Landlords. USH and Bartle filed a motion for summary judgment, Hoosier filed three motions for summary judgment, in which USH and Bartle joined, and Landlords filed a motion for summary judgment. The trial court issued its Ruling, the subject of our prior opinion, denying, inter alia, Landlords' motion for summary judgment and granting Hoosier's first summary judgment motion. We affirmed the trial court.

### Discussion and Decision

### I. The Trial Court's Ruling

Landlords contend that we misstated the trial court's Ruling. Although Landlords do not assert, nor do we believe, that our analysis is materially affected by what they deem is our "misapprehension" of the trial court's Ruling, we address this issue to promote clarity.

In our prior opinion, we stated, "The trial court denied Landlord[s'] summary judgment motion on the issues of notice and opportunity to cure and whether USH breached the Lease *such that* Landlords were entitled to terminate the Lease and recover possession of Grandview." *T–3 Martinsville*, 911 N.E.2d at 108 (footnote omitted) (emphasis added). Focusing solely on the first part of this statement, Landlords argue that the parties never disputed that USH breached the terms of the Lease by failing to make monthly rental payments and that the trial court acknowledged that USH's failure to pay rent is an Event of Default under the Lease. We have always been fully cognizant that USH's failure to pay rent was an Event of Default under the Lease. Our entire discussion in Section I of our prior opinion, dealing with which Events of Default are subject to the notice of default and oppor-

tunity to cure requirements under the Lease (subparagraph 10.1.9), would be pointless if no Event of Default had occurred. *See id.* at 109–13. We began that section with portions of the Ruling, including the following statement: "Clearly, the failure to pay rent within five (5) business days of the due date is an 'event of default.' Neither [Landlords] [n]or [Appellees] dispute this fact." *Id.* at 109–10.

Landlords have disregarded the latter portion of our restatement of the trial court's Ruling—"*such that* Landlords were entitled to terminate the Lease and recover possession of Grandview." *Id.* at 108. Section 10.1 of the Lease, which governs Events of Default, lists many such events, but not all Events of Default entitle Landlords to terminate the Lease. Landlords are not entitled to terminate the Lease upon certain Events of Default because, pursuant to subparagraph 10.1.9, Landlords are required to provide notice of default and opportunity to cure. To be clear then, the trial court found that USH's failure to pay rent was an Event of Default but that Landlords were not entitled to terminate the Lease because they were required to, but did not, provide USH notice of default and an opportunity to cure.

## II. Notice of Default and Opportunity to Cure

Based on Indiana common law as set forth in *Scott–Reitz*, 658 N.E.2d 98, we concluded in our prior opinion that

Landlords' course of conduct in actively negotiating with Bartle and Reed for an alternative solution for one and a half years demonstrates a willing delay in USH's nonpayment of rent. Based on the designated evidence, we conclude that both parties acquiesced to a delay in the payment of rent, and therefore

neither side can suddenly declare the contract terminated and "simply walk away." *Scott–Reitz*, 658 N.E.2d at 104. Instead, Landlords were required to give reasonable notice to USH with an opportunity to perform within a reasonable amount of time before taking action to terminate the Lease.

*T–3 Martinsville*, 911 N.E.2d at 116. We then addressed Landlords' argument that section 10.5 of the Lease shielded Landlords from waiving their right to terminate the Lease. Section 10.5 provides that no failure of Landlords to insist upon strict performance of any provision of the Lease or to exercise any option, right, power, or remedy contained in the Lease shall be construed as a waiver, modification, or relinquishment thereof as to any similar or different breach and that any waiver by Landlords of any provision must be expressed in writing. *Id.* at 106. We rejected Landlords' argument and concluded that section 10.5 was not applicable because the doctrine of estoppel, rather than waiver, was better suited to the circumstances of the case.

We pause here to make an important distinction. Although we found that section 10.5 was inapplicable based on the concept of estoppel, we did not conclude that Landlords were barred from terminating the Lease based on equitable estoppel. Pursuant to our holding, Landlords are not barred from pursuing their option to terminate the Lease; they are, however, required to provide USH with notice of default and an opportunity to cure before seeking to terminate the Lease.

On rehearing, Landlords argue that our conclusion that section 10.5 is inapplicable based on the doctrine of estoppel is contrary to *Scott–Reitz*, 658 N.E.2d 98, and the authorities cited therein.[1] Landlords

---

1. Landlords' argument presupposes that if the    waiver doctrine fits the circumstances here,

assert that the term "estoppel" never appears in *Scott–Reitz,* while ignoring that "waiver" is also absent from that opinion. Also, other than to assert that the cases cited in *Scott–Reitz* use the word "waiver," Landlords do not articulate why *Scott–Reitz* is based on waiver rather than estoppel. Landlords then fail to discuss the facts and legal analysis of any of the cases they cite. As such, we are unpersuaded that *Scott–Reitz* and cases cited therein support Landlords' argument that because the waiver doctrine applies to this case, section 10.5 precludes Landlords' waiver of their option to terminate the Lease. After carefully reviewing case law and other legal resources, we conclude that this case does not fit neatly within either the doctrine of estoppel or waiver and that it is unnecessary to characterize it as either. Rather, we conclude that a review of Indiana case law supports our conclusion that after having actively participated in, contributed to, and facilitated the nonpayment of rent, Landlords may not suddenly terminate the Lease but are required to provide USH with notice of default and an opportunity to cure within a reasonable amount of time notwithstanding section 10.5 of the Lease.

Given our exhaustive discussion of *Scott–Reitz* in our prior opinion, we will not revisit it here. *See T–3 Martinsville,* 911 N.E.2d at 113–16. We will, however, address the cases cited therein. One such case is *Pierce v. Yochum,* 164 Ind.App. 443, 330 N.E.2d 102 (1975). There, the Pierces, as sellers, and the Yochums, as buyers, entered into a contract for the sale of real estate. The Yochums made irregular payments on the contract and failed to keep the property taxes current. The Pierces sent the Yochums a letter of termi-

nation and filed suit for ejectment and damages. The Pierces claimed that the Yochums were in default of the contract because, among other reasons, the Yochums failed to timely pay property taxes and that such breach was sufficient to allow termination of the contract.

The pertinent provisions of the contract required that (1) "the Buyer shall be liable for and shall pay all taxes, both real and personal on said property[,]" and (2) "[i]n the event that the Buyers should fail to keep the taxes on the premises current . . . then the same at the option of the Sellers may be considered as a subsequent breach of the contract and grounds for terminating same[.]" *Id.* at 455, 330 N.E.2d at 109–10. However, the Pierces emphasized paragraph 16 of the contract, which stated that "[t]he failure of the Sellers to exercise any option herein granted them upon any given default of the Buyers shall not constitute a waiver of their rights to exercise said option or options upon subsequent default of the Buyers." *Id.,* 330 N.E.2d at 110. In an argument very similar to that made here by Landlords regarding section 10.5 of the Lease, the Pierces contended that paragraph 16 demonstrated that "the Yochums could be defaulted for any one breach, regardless of whether past breaches had been waived or ignored." *Id.,* 330 N.E.2d at 110.

To determine whether the Pierces were entitled to terminate the contract, the court relied on equitable principles. After quoting at length from the discussion of "notions of equity" in *Skendzel v. Marshall,* 261 Ind. 226, 301 N.E.2d 641 (1973), the *Pierce* court concluded that "foreclosure of any type would be *inappropriate.*" *Id.* at 457, 330 N.E.2d at 111 (emphasis added). The court concluded as follows:

section 10.5 necessarily applies to preclude our determination that they must provide notice of default to USH and opportunity to cure

before seeking to terminate the Lease. That is a completely different argument.

As indicated by the records kept by Dr. Pierce, it was the rule, rather than the exception, to accept irregular payments. There is some evidence in the record that late payments were also accepted with regard to property taxes[.]
. . . .

We have not found, and Pierces have not pointed out, any record of a demand for delinquent or late taxes prior to the letter of [termination]. It is Pierces' contention, however, that a failure of prior demand does not affect the demand made in [the letter of termination]. Pierces rely on paragraph number sixteen, set out above. Pierces argue that this provision gives them the power to declare default after any breach regardless of whether past breaches have been permitted. It is contended that should this court ignore such a provision, the integrity of all written contracts would suffer.

This court has not ignored the written words of the contract at hand. However, where a particular provision is in dispute, neither can we ignore the conduct of the parties with relation to that provision. . . .

In the case at bar, Pierces had an "option" to declare default that was not exercised prior to [the letter of termination]; although, with regard to the taxes, there is evidence that such an option could have been invoked. We are of the opinion that once Pierces accepted late payments on the taxes without protest or notice of required prompt payment in the future, the provision that the taxes be kept "current" had been waived. Further, as the failure to protest past late payments may have induced Yochums into believing that similar late payments would be accepted without consequence, we conclude that said waiver would continue until such time that Yochums were notified that prompt payment would be required. The [termination] letter to Yochums was not a notice that all delinquencies be cured and that future strict compliance would be required. Rather, the letter stated that there was in fact a breach and that the contract was terminated. *Under the facts of this case we find it consonant with notions of fairness and justice that the contract remain in full force and effect.*

We wish to emphasize that we do not hold that land contracts can never be forfeited. We hold only that the failure to exercise an "option" does not also negate the fact that a past breach occurred, and that no action was taken with reference thereto. To hold otherwise would allow paragraph sixteen to operate as a constant modification of the conduct of the parties within the contractual framework.

*Id.* at 457–59, 330 N.E.2d at 111–12 (citations omitted) (emphasis added).

Two observations about *Pierce* are relevant to our analysis of this case. First, although the *Pierce* court used the term "waiver," it found that the Pierces waived the provision that the taxes *be kept current* by accepting late payments. Thus, *Pierce* was a case concerning strict performance, and the court found that the Pierces waived their right to require strict performance of the payment of taxes. Despite their use of the word "waiver," the *Pierce* court did not find that the Pierces waived the provision requiring that the taxes be paid. In the instant case, Landlords did not merely accept late rent payments. There were *no* rent payments made. Unlike *Pierce*, this is not a case of strict performance. If we were to apply the equivalent concept of waiver here as that applied by the *Pierce* court, the effect would be that Landlords waived the provi-

sion requiring payment of rent. Such an absurd result cannot be countenanced. Further, we observe that the *Pierce* court did not find that the Pierces waived the option to terminate the contract, which is the argument Landlords make here.

A second observation is that the *Pierce* court focused on the conduct of the parties and concluded that based on "notions of fairness and justice," the contract must remain in full force. *See id.* at 459, 330 N.E.2d at 112. Significantly, the *Pierce* court ruled against termination notwithstanding paragraph 16, the contract's nonwaiver provision. In this respect, *Pierce* supports our analysis of the case at bar. In fact, a stronger case against termination exists here than in *Pierce*. The Pierces merely accepted late payments. Here, for a year and a half, USH did not make rent payments, and Landlords did not pursue their option to terminate the Lease. During that time, USH advanced hundreds of thousands of dollars to the Turners' operation in Batesville, Indiana. During that time, Landlords were actively engaged in a course of conduct consisting of negotiations with Bartle and Reed for a possible setoff of the amounts due and owing at Batesville with the amounts due and owing under the Lease. Thus, Bartle and Reed were led to believe that Landlords did not intend to terminate the Lease. In this respect, Landlords facilitated and promoted the nonpayment of rent. Further, Landlords knew that Reed was willing to cure the nonpayment of rent. We conclude that our decision is not contrary to *Pierce* but is bolstered by it.

Another case relied on by *Scott–Reitz* and cited by Landlords is *Keliher v. Cure,* 534 N.E.2d 1133 (Ind.Ct.App.1989). There, another panel of this Court did not find that the term "waiver" was applicable to its analysis. Daniel Keliher, as seller, and Eric and Elizabeth Cure, as buyers,

entered into a real estate purchase agreement on December 22, 1983. The Cures made an earnest money deposit of $5000. Pursuant to the agreement, the Cures had twenty working days to obtain a financing commitment, which was extended ten days to February 6, 1984. The agreement also provided that if a financing commitment was not obtained within the time specified, the agreement would terminate unless an extension of time was mutually agreed to in writing.

The Cures obtained a financing commitment from Citicorp Homeowners, Inc., for the purchase price less $20,000 that the Cures were planning to obtain from Eric's parents. The financing commitment was subject to a requirement regarding the nature of that $20,000. Specifically, the Cures needed to provide proof to Citicorp that the $20,000 was a gift from Eric's parents. If the $20,000 was a loan from his parents, then the amount would be considered undisclosed debt and would need approval. Negotiations continued past the February 6 date, with Keliher's full knowledge and acquiescence. On February 14, Citicorp removed the proof of gift condition and issued an unconditional financing commitment. The Cures, however, had changed their minds and requested a refund of their earnest money deposit. Keliher refused, and the Cures filed an action to recover their deposit. Keliher counterclaimed for breach of contract. The trial court entered judgment in favor of the Cures, finding that because a favorable loan commitment had not been obtained before February 6, the purchase agreement became null and void. Keliher appealed.

The *Keliher* court phrased the issue as follows: "The question as to the return of Cures' earnest money is whether the purchase agreement's life was extended beyond February 6." *Id.* at 1136. The court

noted that it was not until February 14 that the Cures attempted to rescind the purchase agreement. As to waiver, the court stated, "Keliher incorrectly applies the term 'waiver' to the conduct of the Cures.... The term 'waiver,' *if* it were applicable to the facts before us would necessarily focus upon the conduct of Keliher." *Id.* at 1137 (emphasis added). The court then made the following observations, which constitute the basis of the *Scott–Reitz* court's citation to *Keliher.*

> The conduct of the parties here discloses that each of them considered the purchase agreement to be of full force and effect after February 6 and up and until February 14 when Cures decided they had made an unwise contract.
>
> A purchaser, following demonstration of a seller's acquiescence in delay, is entitled to expect the seller to continue to abide by the contract until notice is given to the contrary. Conversely, when the seller expresses a willingness to acquiesce in a delay and to assist the purchaser to carry out the contract after a time limit has expired, the seller is entitled to rely upon the purchaser to not suddenly renege on the bargain.

*Id.* (citations omitted). The *Keliher* court held that "the parties served, as a matter of law, to extend the period for obtaining an unconditional commitment so long as that extension did not jeopardize closing the sale on March 4." *Id.* at 1138.

*Keliher* does not support Landlords' argument. Rather, the reliance of the *Keliher* court on the conduct of the parties and its focus on whether there was a willing acquiescence sustains our determination. We find that the other two cases cited by Landlords are similarly unpersuasive. Accordingly, we affirm our conclusion that Landlords participated in and facilitated a willing delay in the nonpayment of rent, and therefore were required to provide notice of default and an opportunity to cure before seeking to terminate the Lease.

### III. Requirements for Notice of Default and Opportunity to Cure

Finally, Landlords assert that our opinion failed to provide guidance as to the form and timing of the notice of default Landlords are required to provide USH and to the scope of the opportunity to cure that must be extended to USH. We note that on February 29, 2008, the trial court issued its Prejudgment Possession Ruling, which ordered, inter alia, that to cure the Event of Default of nonpayment of past rent, either USH or Hoosier was required to pay to Landlords the sum of $741,987.47 not later than Thursday, March 20, 2008, at noon. *T–3 Martinsville,* 911 N.E.2d at 107. Hoosier has paid Landlord. The parties are still disputing the exact amount of rent owed, and the trial court has yet to rule on that issue, as well as others. Given that Landlord has been paid pursuant to the Prejudgment Possession Ruling, notice of default is deemed given to USH, and the time for its opportunity to cure will not expire until the date for payment set forth in the trial court's final judgment as to the rent owed Landlords.

Landlords also claim that our opinion creates an intolerable situation because it forecloses a landlord's ability to terminate a lease with a tenant who habitually fails to pay rent. We think this is an inaccurate overstatement of the effect of our holding. Landlords are not foreclosed from terminating the Lease. *See Pierce,* 164 Ind.App. at 459, 330 N.E.2d at 112 ("We wish to emphasize that we do not hold that land contracts can never be forfeited. We hold only that the failure to exercise an 'option' does not also negate the fact that a past breach occurred, and that no action was taken with reference

thereto.") (citation omitted). However, under the circumstances, we held that Landlords were required to give notice of default and an opportunity to cure before doing so.[2] Our holding is consonant with those in *Scott–Reitz, Pierce,* and *Keliher.* These cases are fact-sensitive. The conduct of the parties is determinative. Here, the parties exhibited a very active, willing, and long-lived collaboration in the nonpayment of rent, and Hoosier was prepared to cure it.

Accordingly, we grant rehearing and affirm our previous opinion.

BRADFORD, J., and BROWN, J., concur.

---

2. Landlords complain that a lessee's complete failure to pay rent "can cause irreparable harm to a landlord that has cash flow to monitor, overhead to satisfy, and mortgage payments to make." Appellants' Pet. at 11. We think that Landlords' delay of one and a half years demonstrates that such was not the case here. Where such a situation does exist, the landlord is free to seek its remedies immediately.