**T–3 MARTINSVILLE, LLC, and MS Martinsville, LLC, Appellants–Plaintiffs–Counterclaim Defendants/Cross–Appellees,**

v.

**U.S. HOLDING, LLC, Hoosier Enterprises IX, Inc., and John W. Bartle, Appellees–Defendants–Counterclaimants/Cross–Appellants.**

No. 55A01–0810–CV–462.

Court of Appeals of Indiana.

Aug. 14, 2009.

C. Daniel Motsinger, Libby Y. Mote, Krieg DeVault LLP, Indianapolis, IN, Attorneys for Appellants.

David F. McNamar, McNamar & Associates, P.C., Indianapolis, IN, Attorney for Appellees, U.S. Holding, LLC, and John W. Bartle.

Richard B. Kaufman, Doninger Tuohy & Bailey LLP, Indianapolis, IN, Attorney for Appellee, Hoosier Enterprises IX, Inc.

## OPINION

CRONE, Judge.

### Case Summary

T–3 Martinsville, LLC, and MS Martinsville, LLC ("Landlords"), bring this interlocutory appeal of the rulings against them in the trial court's "Ruling on Motions for Summary Judgment." US Holding, LLC ("USH"), John W. Bartle, and Hoosier Enterprises IX, Inc. ("Hoosier") (sometimes collectively referred to as "Appellees"), cross-appeal the rulings against them in the aforementioned order. We affirm.[1]

### Issues

Landlords raise one issue, which we restate as follows:

I. Whether Landlords were required to provide USH with notice and an opportunity to cure its default under a lease for nonpayment of rent.

We also address the following issues raised on cross-appeal: [2]

II. Whether the trial court's use of compound interest in determining

---

1. By separate order, we deny Appellees' request for oral argument. Also by separate order, we deny Hoosier's motion to strike portions of Landlords' reply brief and Hoosier's motion for leave to file reply to Landlords' response to Hoosier's motion to strike.

2. USH and Bartle in their brief, and Hoosier in its brief, separately raise issues II through IV. Hoosier alone raises issue V.

the amount USH owes Landlords is ripe for appellate review;

III. Whether the trial court erred in declining to find that USH's default has been cured;

IV. Whether the trial court erred in finding that specific performance of USH's option to purchase is premature; and

V. Whether the trial court erred in entering summary judgment in favor of Landlords and against Hoosier on its counterclaims.

## Facts and Procedural History[3]

The center of the current controversy is a lease ("the Lease"), to which Landlords and USH are parties, and the nonpayment of rent thereunder. The relevant facts are undisputed. On April 1, 2004, Rynard III, LLC ("Rynard"), owner of the Grandview Convalescent Center ("Grandview") located in Martinsville, Indiana, entered into the Lease with USH, as tenant, and Bartle, as guarantor, wherein USH agreed to lease Grandview for a term of twenty years. Contemporaneously with the Lease, USH entered into a sub-

3. Hoosier's appellee's brief fails to conform to Indiana Appellate Rule 46 in several important respects. Appellate Rule 46(A)(4) provides that the statement of issues "shall concisely and particularly describe each issue presented for review." Concise is defined as "marked by brevity of expression or statement: free from all elaboration and superfluous detail[.]" Merriam–Webster Online Dictionary, http://www.merriam-webster.com/dictionary/concise. Hoosier's four-page statement of issues is a mixture of issues, facts, and argument. Hoosier's Appellee's Br. at 1–5. It is most emphatically not concise. In addition, both Hoosier and USH failed to identify which issues relate to Landlords' appeal and which issues are raised on cross-appeal. Finally, Hoosier appears to raise an issue in its argument that it did not set forth in its statement of issues. See id. at 45–47 (arguing that Hoosier's motion to strike portions of Landlords' designation of evidence in support of Landlords' motion for summary judgment should be granted).

Appellate Rule 46(A)(8)(a) provides that "the argument must contain the contentions of the [cross-]appellant on the issues presented, supported by cogent reasoning[,]" and Rule 46(B)(2) provides that the appellee's argument "shall address the contentions raised in the appellant's argument." Hoosier's brief violates these rules by attempting to "incorporate by reference" more than a hundred pages from other documents, including Hoosier's answer to the complaint, all three of its summary judgment motions, and its response to Landlords' motion for summary judgment. Id. at 8, 40, 44, 45–46. We have previously expressed our disapproval with such attempts

and declined to consider arguments outside the brief. See Oxley v. Lenn, 819 N.E.2d 851, 855 n. 2 (Ind.Ct.App.2004) (refusing to consider the argument section of a summary judgment brief submitted to the trial court); Greg Allen Constr. Co. v. Estelle, 762 N.E.2d 760, 778–79 (Ind.Ct.App.2002) (finding that where appellant had merely asked to incorporate by reference its argument made at trial, appellant had waived issue for appellate review), aff'd in relevant part, vacated in part on other grounds by 798 N.E.2d 171 (Ind.2003); Pluard ex rel. Pluard v. Patients Comp. Fund, 705 N.E.2d 1035, 1038–39 (Ind.Ct.App.1999) (stating that attempt to incorporate entire argument raised and argued to trial court by reference in footnote does not comply with either letter or spirit of former Appellate Rules), trans. denied. Accordingly, we will consider only the argument presented in Hoosier's appellee's brief. Any other argument incorporated by reference is waived, including whether Hoosier's motion to strike portions of Landlords' designation of evidence in support of Landlords' summary judgment motion should be granted. We note that Hoosier claims in its reply brief that "the Hoosier Brief has specifically and in great detail (and without any incorporation by reference) moved to strike the Complaint and Turner Affidavit to any extent necessary to grant Hoosier Motions." Hoosier's Reply Br. at 11 (emphasis added). This claim is simply untrue. See Hoosier's Appellee's Br. at 45 ("In the Hoosier Response, the Defendants moved to strike significant portions of the Landlords Designation. App. at 725–729. Those motions to strike are entirely incorporated within this Brief by reference [.]") (emphasis added).

lease agreement with Hoosier, wherein Hoosier subleased Grandview for a term of twenty years to operate a comprehensive care nursing facility. Subsequently, Landlords purchased Grandview from Rynard. On March 24, 2006, Rynard, as seller, and Landlords, as purchasers, entered into an "Assignment and Assumption Agreement," wherein Rynard assigned and Landlords assumed Rynard's rights and obligations under the Lease.

The Lease included the following relevant provisions:

10. *Events of Default and Landlord's Remedies.*

10.1 *Events of Default.* The occurrence of any of the following shall constitute an event of default on the part of Tenant hereunder ("Event of Default"):

10.1.1 The failure to pay within five (5) business days of the date when due any Rent, taxes or assessments, utilities, premiums for insurance or other charges or payments required of Tenant under this Lease;

10.1.2 Any other material default by Tenant (or any Affiliate thereof) under any agreement between Tenant (or any Affiliate) and Landlord or any Affiliate of Landlord other than this Lease, which default is not cured within any applicable cure period provided in such agreement; provided, however, so long as Tenant is not in default of the monetary obligations of this Lease, then any matter which would fall within the scope of the Section 10.1.2 shall not constitute an Event of Default;

. . .

10.1.5 Any revocation of the nursing home license for Facility of termination of the certification under the Medicare and/or Medicaid programs (or any successor program);

. . .

10.1.8 The filing by tenant of a voluntary petition under any federal bankruptcy law or under the law of any state . . .;

10.1.9 The failure to perform or comply with any other term or provision of the Lease not requiring the payment of money (except a default under Section 10.1.5 or 10.1.8), including, without limitation, the failure to comply with the provisions hereof pertaining to the use, operation and maintenance of the Premises; provided, however, the default described in this Section 10.1.9 is curable and shall be deemed cured, if: (a) within ten (10) business days of Tenant's receipt of a notice of default from Landlord, Tenant gives Landlord notice of its intent to cure such default; and (b) Tenant cures such default within thirty (30) days after such notice from Landlord, unless such default cannot with due diligence be cured within a period of thirty (30) days because of the nature of the default or delays beyond the control of Tenant, and cure after such thirty (30) day period will not have a material and adverse effect upon the Premises, in which case such default shall not constitute an Event of Default if Tenant uses its best efforts to cure such default by promptly commencing and diligently pursuing such cure to the completion thereof, and such default does not cause Landlord to be in default of any other agreement to which Landlord is a party; provided, however, no cure period for such default shall continue for more than ninety (90) days from Tenant's receipt of notice of such default from Landlord;

10.1.10 There shall be no cure period in the event of breach by Tenant of (a) the obligation to obtain insurance as provided in Section 4, (b) the provisions

of Section 21,[4] or (c) the provisions of Section 23,[5] and

10.1.11 All notice and cure periods provided herein shall run concurrently with any notice or cure periods provided by applicable law.

10.2 *Remedies.* Upon the occurrence of an Event of Default, Landlord may exercise all rights and remedies under this Lease and the laws of the State of Indiana available to a lessor of real and personal property in the event of a default by its lessee. Without limiting the foregoing, Landlord shall have the right to do any of the following:

10.2.1 Sue for the specific performance of any covenant of Tenant under this Lease as to which Tenant is in breach;

10.2.2 Enter upon the Premises, terminate this Lease, dispossess Tenant from the Premises and/or collect money damages by reason of Tenant's breach, including, without limitation, the acceleration of all rent which would have accrued after such termination and all obligations and liabilities of Tenant under this Lease which survive the termination of the Term; provided however, Landlord shall use reasonable efforts to mitigate its damages;

10.2.3 Elect to leave this Lease in place and sue for rent and/or other money damages as the same come due; provided, however, Landlord shall use reasonable efforts to mitigate its damages[.]

. . . .

10.3 *Receivership.* Tenant acknowledges that one of the rights and remedies available to Landlord under applicable law is to apply to a court of competent jurisdiction for the appointment of a receiver to take possession of the Premises, to collect the rents, issues, profits and income of the Premises and to manage the operation of the Premises. Upon Tenant's failure to pay within thirty (30) calendar days of the date when due any Rent, or in the event a Sanction is imposed and not enjoined, stayed or otherwise held in abeyance as contemplated under Section 5.2.2, and in addition to any other right or remedy of Landlord under this Lease, Landlord may petition any appropriate court for the appointment of a receiver to take possession of the Premises, to manage the operation of the Premises, to collect and disburse all rents, issues, profits and income generated thereby and to preserve or replace to the extent possible any operating license for the Premises or to otherwise substitute the licensee or provider thereof. . . . .

. . . .

10.5 *Remedies Cumulative: No Waiver.* No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given hereunder or now or hereafter existing at law or in[ ]equity. No failure of Landlord to insist at any time upon the strict performance of any provision of this Lease or to exercise any option, right, power or remedy contained in this Lease shall be construed as a waiver, modification or relinquishment thereof as to any similar or different breach (future or otherwise) by Tenant. A receipt by Landlord of any rent or other sum due hereunder (including any late charge) with knowledge of the

---

4. Section 21 is titled "Preservation of Investment."

5. Section 23 is titled "Assignment and Subletting."

breach of any provision contained in this Lease shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in a writing signed by Landlord.

Appellants' App. at 70–73.

Apparently, all parties performed their obligations under their respective agreements until September 2006. However, it is undisputed that from September 2006 to February 2008, USH did not make its rent payments to Landlords as required under the Lease. (We provide a more detailed discussion of the parties' conduct during this period in section I below.)

On February 18, 2008, Landlords filed their complaint against Appellees, alleging the following claims and seeking the following relief: Count 1, breach of lease by USH by reason of failure to pay rent from September 2006 through February 2008 and damages for breach of lease; Count 2, ejectment of USH and Hoosier and immediate possession of the premises; Count 3, temporary restraining order and preliminary injunction to prevent USH and Hoosier from removing any property from Grandview, removing any patients from Grandview, and granting possession to Landlords; Count 4, breach of guaranty claim against Bartle for damages caused by USH. *Id.* at 40–51.

On February 19, 2008, following a hearing, the trial court denied Landlords' request for a temporary restraining order. On February 29, 2008, following a hearing, the trial court issued a ruling on Landlords' motion for immediate possession ("the Prejudgment Possession Ruling"), which essentially required either USH or Hoosier to pay Landlords the delinquent rent and back charges or lose possession of Grandview. The Prejudgment Possession Ruling provides in relevant part:

2. Although each missed payment of rent and late charges may be an 'event of default' under the terms of the lease, USH is not precluded from curing the default. [Landlords] did not provide notice of default to USH in the manner stated in the lease agreement until [Landlords] filed their Verified Complaint on 2–18–2008 and served the complaint on USH and [Hoosier] on 2–19–2008.

3. The filing of the Verified Complaint by [Landlords] is not, at this time, considered "Notice of Termination," as the issue of whether the [L]ease has been properly terminated must be resolved in the final judgment in this case, not at this pre-judgment stage of the proceedings.

4. **IT IS THEREFORE ORDERED THAT:** USH and [Hoosier] may retain possession of Grandview during the pendency of this action upon the condition that USH and/or [Hoosier] fully comply with the following conditions . . . :

(A) To cure the 'event of default' of nonpayment of past rent, either USH or [Hoosier] must pay to [Landlords] the sum of $741,987.47 . . . not later than THURSDAY, MARCH 20, 2008 AT NOON.

. . . .

(D) **IT IS THEREFORE ORDERED THAT:** Any payments made by [Hoosier] to [Landlords] under the terms of [this order] shall be setoff to any rent payments owed by [Hoosier] to USH under the sub-lease to the extent that [Hoosier's] payments to [Landlords] equal or exceed the amount of rent payable to USH under the terms of the sublease.

*Id.* at 222–23.

Pursuant to the Prejudgment Possession Ruling, Hoosier timely paid $741,987.47 to

Landlords, and Landlords accepted the payment.

On April 8, 2008, Hoosier counterclaimed against Landlords asserting (1) tortious interference with sublease; (2) civil violations of Indiana Code Section 35–43 et seq. (offenses against property); (3) unjust enrichment; (4) money had and received; and (5) specific performance of exercise of option to purchase.[6] Id. at 249–57.

On March 26, 2008, USH and Bartle filed their motion for summary judgment, arguing that because Landlords had been paid the amount as ordered by the Prejudgment Possession Ruling, the alleged default of nonpayment of rent had been cured and there was no genuine issue of material fact remaining as to Landlords' claims. USH–Bartle's Appellees' App. at 20.

On June 12, 2008, Hoosier filed three motions for summary judgment, in which USH and Bartle joined. In its first summary judgment motion ("First Motion"), Hoosier alleged that there was no genuine issue of material fact that USH was entitled to but did not receive notice of default and an opportunity to cure, and therefore Landlords are barred from asserting an Event of Default under the Lease and their claim for termination of the Lease is premature. Appellants' App. at 321–22. In its second summary judgment motion ("Second Motion"), Hoosier argued that any prior violation of the Lease was cured by its payment to Landlords pursuant to the Prejudgment Possession Ruling and that Landlords were overpaid by Hoosier, for which Hoosier was entitled to summary judgment in the amount of the overpay-

ment. Id. at 599–600. Finally, in its third summary judgment motion ("Third Motion"), Hoosier contended that Landlords breached the Lease by refusing to honor USH and Hoosier's option to purchase Grandview under the terms of the Lease. Id. at 966–68. Further, Hoosier requested that the trial court order specific performance of the option-to-purchase provision in the Lease.

On June 18, 2008, Landlords filed their summary judgment motion, in which they argued that the Lease does not require notice and an opportunity to cure for nonpayment of rent, that USH breached the Lease by failing to pay rent when due, and that as such, Landlords were entitled to terminate the Lease, recover possession of Grandview, and collect past due rents and fees. In addition, Landlords sought summary judgment in their favor on all counterclaims raised by USH, Bartle, and Hoosier.

On August 15, 2008, a hearing on all five of the summary judgment motions was held. On August 29, 2008, the trial court issued its "Ruling on Motions for Summary Judgment" ("the Ruling"). The trial court denied Landlord's summary judgment motion on the issues of notice and opportunity to cure and whether USH breached the Lease such that Landlords were entitled to terminate the Lease and recover possession of Grandview.[7] The trial court granted Landlords' summary judgment motion on Hoosier's counterclaims for (1) tortious interference with sublease; (2) civil violations of Indiana Code Section 35–43 et seq.; (3) unjust en-

---

6. USH and Bartle also filed counterclaims against Landlords, but they do not appeal the trial court's summary judgment ruling against them on such counterclaims.

7. Landlords do not appeal the denial of their summary judgment motion on the issue of whether USH breached the Lease such that they are entitled to terminate the Lease and take possession of Grandview.

richment and money had and received;[8] and (4) specific performance of the exercise of the option to purchase. The trial court denied USH and Bartle's summary judgment motion. The trial court granted Hoosier's First Motion but denied its Second Motion and Third Motion. Given the length and complexity of the Ruling, we set forth its provisions as necessary at the beginning of the relevant discussion section.

## Discussion and Decision

### Standard of Review

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). Our standard of review is well settled:

> In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper.

*Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 687 (Ind.Ct.App.2006) (citations omitted). Specific findings of fact and conclusions of law are neither required nor prohibited in the summary judgment context. *City of Gary v. Ind. Bell Tel. Co.*, 732 N.E.2d 149, 153 (Ind.2000). Such findings aid our review of a summary judgment, but they are not binding on this

Court. *Id.* In reviewing a trial court's ruling on a motion for summary judgment, we may affirm on any grounds supported by the Indiana Trial Rule 56 materials. *Catt v. Bd. of Comm'rs of Knox County*, 779 N.E.2d 1, 3 (Ind.2002). "The fact that the parties made cross-motions for summary judgment does not alter our standard of review. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind.Ct.App.1997), *trans. denied* (1998).

### I. Notice and Opportunity to Cure

The trial court found that the Lease required Landlords to provide notice of default and an opportunity to cure for the nonpayment of rent. Appellants' App. at 28, 32. This finding is the basis for the trial court's grant of Hoosier's First Motion and denial of Landlords' summary judgment motion on this issue. The Ruling reads in pertinent part as follows:

> [Landlords] argue that the language of subsection 10.1.9 is dispositive and they focus solely on the phrase "not requiring the payment of money" in support of [Landlords'] opinion that nonpayment of rent is excluded from the requirements of notice of default and "cure period" set forth in the subsection 10.1.9. The Court finds otherwise.
>
> As previously noted, the Court must examine the entire lease agreement, not just one sentence or phrase, in determining the intent of the parties at the time the contract was executed [between Rynard and USH]. Clearly, the failure to pay rent within five (5) business days of the due date is an "event of default." Neither [Landlords] [n]or [Appellees]

8. The trial court's Ruling combined these two theories.

dispute this fact. But, the Court finds that the intent of the parties within the four corners of the lease agreement at the time of execution of the contract was that the event of default of non-payment of rent was and is "curable" and required Landlord[s] to give the Tenant written notice of default, thus triggering the requirements of the Tenant to give [Landlords] notice of intent to cure and to cure such default within the time limits set forth in subparagraph 10.1.9.

This intent (i.e., that there is a requirement of notice of default and the ability to cure within a limited time) is supported by common sense, and by the undisputed fact that Grandview has been and is being operated as a skilled nursing facility for patients requiring continuous care. This is not a commercial lease concerning a warehouse, office building or retail facility. A disruption in service and the emotional toil [sic] that a sudden eviction of the operator of the skilled nursing facility would impose upon patients, family members and staff of the facility would be devastating. It is obvious that a continuum of care for the patients was a priority in the parties' original intent with the terms of the contract. Delays in payment of rent could be "cured" by payment of rent, late fees and other costs incurred by the Landlord[s]. If the Tenant did not cure the non-payment of rent, the transition period of thirty (30) days provided for in the default cure period would give the Landlord[s], Tenant, patients, families of patients and staff time to adjust to the transition in operational control of the facility.

The Court finds that the phrase "not requiring the payment of money" in subparagraph 10.1.9 refers to the vast array of *other* duties and responsibilities of the Tenant under the terms of the lease agreement, such as: Tenant's mainte-nance requirements under Section 5; Tenant's personal property requirements under Section 7; financial and regulatory reports under Section 9. The Court finds that the *only* subparagraph of the [L]ease that *unequivocally* removed the possibility of *any* cure period after default is subparagraph 10.1.10 pertaining to Tenant's requirements regarding insurance coverage (Section 4), Tenant's diversion of residents to other nursing facilities owned by the Tenant (Section 21: Preservation of Investment), and Tenant's assignment or subletting of the premises without Landlord[s'] consent (Section 23).

Although Subsection 10.1 is entitled "Events of Default," this subsection clearly encompasses not only the definition of default events, but also the cure period afforded to the Tenant if the Tenant has not committed the forbidden acts described in Sections 4, 21, and 23 of the Master Lease.

There is no genuine issue of fact that [Appellees] failed to pay rent to the [Landlords] for a period of several months, and the non-payment of rents when due was an event of default under the Master Lease. But, as a matter of law under the terms of the contract, the Court finds that [Landlords] were required to provide notice of default to [USH] which [Landlords] did not do. The filing of [Landlords'] Complaint is not, as a matter of law, the notice of default required under the terms of the lease agreement.

**RULING: The Court will therefore enter partial summary judgment on [Hoosier's First Motion] solely on this issue: That the [Landlords] did not comply with the conditions precedent to the filing of the complaint (and [Landlords'] request for eviction and possession of the premises) by failing**

to provide notice of default to USH as required by subparagraph 10.1.9 and Section 16,[9] which would then have given USH the opportunity to cure the default within the time periods set forth in subparagraph 10.1.9. As a result, the filing of the [Landlords'] Complaint was premature and did not terminate the lease agreement.

*Id.* at 26–28 (emphasis in original).

■ On appeal, the parties dispute the trial court's interpretation of the Lease. A lease is construed in the same manner as any other contract. *Stout v. Kokomo Manor Apts.,* 677 N.E.2d 1060, 1064 (Ind.Ct.App.1997). The construction of the terms of a written contract is a pure question of law, which we review de novo. *Bailey v. Mann,* 895 N.E.2d 1215, 1217 (Ind.2008).

> When construing the meaning of a contract, our primary task is to determine and effectuate the intent of the parties. First, we must determine whether the language of the contract is ambiguous. The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts. If the language of the instrument is unambiguous, the parties' intent will be determined from the four corners of the contract. If, on the other hand, a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact-finder. When interpreting a written contract, we attempt to determine the intent of the parties at the time the contract was made. We do this by examining the language used in the instrument to express their rights and duties. We read the contract as a whole and will attempt to construe the contrac-

tual language so as not to render any words, phrases, or terms ineffective or meaningless. We must accept an interpretation of the contract that harmonizes its provisions, rather than one that places the provisions in conflict.

*Whitaker v. Brunner,* 814 N.E.2d 288, 293–94 (Ind.Ct.App.2004) (citations and quotation marks omitted), *trans. denied* (2005).

■ The parties agree that section 10.1 of the Lease governs "Events of Default" and that subparagraph 10.1.1 lists the failure to pay rent as an Event of Default. The parties' disagreement centers on subparagraph 10.1.9, which describes another Event of Default as the "failure to perform or comply with any other term or provision of the Lease *not requiring the payment of money* ... including ... the failure to comply with the provisions hereof pertaining to the use, operation and maintenance of the Premises[.]" Appellants' App. at 71 (emphasis added). The trial court found that the phrase "not requiring the payment of money" refers to other duties and responsibilities of the tenant under the terms of the Lease, such as maintenance requirements, personal property requirements, and financial and regulatory reporting requirements. *Id.* at 27. Like the trial court, we find that the language of the Lease is unambiguous. However, we find that the language unambiguously excludes the payment of money from the notice of default and opportunity to cure requirements of subparagraph 10.1.9.

To understand the meaning of subparagraph 10.1.9, it is helpful to read the provision without the phrase "not requiring the payment of money." Without that phrase, 10.1.9 reads, "The failure to perform or

---

**9.** Section 16 sets forth the requirements for notices and demands under the Lease, such as that must be in writing, how they shall be

sent, and where they shall be sent. Appellants' App. at 76.

comply with *any other* term or provision of the Lease ... including ... the failure to comply with the provisions hereof pertaining to the use, operation, and maintenance of the Premises[.]" *Id.* at 71 (emphasis added). Thus, 10.1.9 is a catch-all provision, covering the failure to perform *any other* term of the Lease. Specifically, under 10.1.9, the failure to comply with the use, operation, and maintenance requirements in section 5 of the Lease is an Event of Default.[10]

When we reinsert the phrase "not requiring the payment of money," it is clear that the phrase excludes obligations to make payments of money from the definition of an Event of Default in subparagraph 10.1.9. There can be no dispute that the payment of rent is a payment of money. In addition, 10.1.9 states, "the default described in this Section 10.1.9 is curable." *Id.* As such, the notice and opportunity to cure provisions apply only to 10.1.9 Events of Default. The payment of rent is excluded from the definition of default in 10.1.9, and therefore the notice and cure provisions of 10.1.9 do not apply to it. We think that the trial court's interpretation of the Lease renders the phrase "not requiring the payment of money" meaningless.

Our interpretation is in harmony with subparagraph 10.1.10, which states that there is no cure period for breaches under section 4 (describing the types of insurance the tenant is obligated to obtain), section 21 (prohibiting the tenant from diverting patients to other facilities owned by the tenant), and section 23 (setting forth the terms for assignment and subletting). *Id.* These sections govern all sorts of obligations that do not involve the payment of money. Consequently breaches under these sections would have fallen into the ambit of subparagraph 10.1.9 if they were not specifically excluded.

In addition, our interpretation harmonizes subparagraph 10.1.9 with section 10.3, entitled "Receivership." This provision specifically provides that Landlords are entitled to apply to a court for a receiver to take possession of Grandview "[u]pon Tenant's failure to pay within thirty (30) calendar days of the date when due any Rent[.]" *Id.* at 72. It does not say within thirty days *after notice of default* to Tenant. Since 10.1.9 enables the tenant to cure the default within thirty days of receiving notice of default from Landlords, and since the notice of default would not be given until sometime after the date of the default, if the notice and opportunity to cure provisions of 10.1.9 were applicable to the nonpayment of rent, section 10.3 would permit Landlords to apply for a receiver before the period to cure provided by 10.1.9 had expired.

Further, while we recognize that Grandview is a skilled nursing facility with patients requiring a continuum of care, this does not lead us to conclude that the parties must have intended that the tenant be provided with notice and opportunity to cure with respect to nonpayment of rent. Section 10.3 provides Landlords with the option of appointing a receiver and thus provides for the continued operation of Grandview as a skilled nursing facility where nonpayment of rent is at issue. Further, subparagraph 10.1.10, which specifically excludes breaches under sections

---

10. Section 5 requires the tenant to keep the premises in good condition, make all repairs, maintain Landlords' personal property, comply with federal, state, and local licensing laws, occupy the premises solely as a nursing facility, and comply with IRS guidelines; allows the tenant to alter, improve, or expand the facilities and request that Landlords fund capital improvements; and prohibits the tenant from permitting liens. Appellants' App. at 64–66.

4, 21, and 23 from the notice and opportunity to cure requirements, demonstrates the parties' intent to dispense these requirements under certain Events of Default. Thus, the nature of the premises is not necessarily a basis for concluding that the Lease requires notice and opportunity to cure for nonpayment of rent. For all the reasons discussed above, we conclude that the trial court erred in finding that subparagraph 10.1.9 requires Landlords to provide notice of default to USH and an opportunity to cure as to the nonpayment of rent.

 That said, we must address Hoosier's argument that Landlords were required to provide notice to USH and an opportunity to cure pursuant to Indiana common law principles, and therefore the trial court did not err in ruling that Landlords' complaint was premature and did not terminate the Lease.[11] In support of its argument, Hoosier relies on *Scott–Reitz Ltd. v. Rein Warsaw Associates,* 658 N.E.2d 98 (Ind.Ct.App.1995).

In *Scott–Reitz,* the lessee, Scott, entered into a lease agreement with Rein Warsaw Associates, as lessor, wherein Rein was to build a grocery store on its property and Scott was to finish the building by installing the necessary trade fixtures and equipment. Rein was required to develop an overall building plan for the grocery store after Scott provided it with building details such as general plumbing and electrical plans. Rein was also required to obtain the necessary building permits. After the execution of the lease, Scott became concerned about the startup costs it faced with the grocery store and another store it was opening and decided to postpone the openings of both stores for a year. Meanwhile, Rein was experiencing difficulties in obtaining the necessary wetlands permit for the construction of the grocery store. Consequently, Rein offered Scott a different facility for his grocery store. Scott found that the facility, a Big Wheel Store, could be converted into a grocery store and for six months thereafter "engaged in a course of conduct evidencing the parties' interest in converting the Big Wheel Store into Scott's [ ] grocery store in lieu of constructing a new store as called for in the Lease." *Id.* at 102. On the same day that Scott was meeting with a Big Wheel Store representative to discuss details for its conversion, Rein received notice from Scott that Scott was repudiating the lease.

Rein filed a complaint against Scott for breach of the lease. The trial court entered summary judgment in favor of Rein. Scott appealed, arguing that Rein could not recover for breach of the lease because Rein itself had defaulted under the lease by failing to deliver possession of the grocery store building within a reasonable time. In addressing Scott's argument, we first noted that the lease contained an express provision that required Scott to provide Rein notification and thirty days' opportunity to cure before taking action to terminate the lease. *Id.* at 103. Thus, we concluded that even if there had been an unreasonable delay caused by Rein, Scott could not unilaterally terminate the lease

---

11. Landlords assert that

Appellees' waiver and modification theories contradict the assertion that the clear and unambiguous terms of the Lease compel notice of payment default and the opportunity to cure. By invoking waiver and modification as grounds for affirming the Summary Judgment Ruling, Appellees effectively concede that the plain language of the Lease did not require the Landlord[s] to give [USH] notice of payment default and the opportunity to cure before filing its Complaint.

Appellants' Reply Br. at 6 n. 5. Landlords cite no authority in support of this assertion. Further, we fail to see how Appellees' alternative argument amounts to a concession regarding the interpretation of the Lease.

without first providing Rein thirty days' notice and opportunity to cure. However, we then stated, "notwithstanding the existence of the express provision within the [l]ease, the common law dictates the same result." *Id.* We concluded as follows:

[W]hen a party deviates from strict performance called for by the contract, the former cannot suddenly declare the deviation a breach of contract. *See Pierce v. Yochum* (1975), 164 Ind.App. 443, 457, 330 N.E.2d 102, 112, *trans. denied.* Notice must be given to the other party that strict performance will be required in the future, then if the party continues to deviate, a default can be declared. *Id.* Similarly, when both parties to a contract acquiesce to a delay, neither side can suddenly declare the contract rescinded and simply walk away. Notice must be given to the other party along with an opportunity to perform within a reasonable time. *Keliher v. Cure* (1989), Ind.App., 534 N.E.2d 1133, 1137.

Shortly after executing the [l]ease, Scott became concerned with the start up costs it faced with the possible simultaneous construction of the Kendallville and Warsaw stores and desired to postpone the opening of both stores until 1991. Thereafter, Scott withheld the tenant details necessary to begin construction of the store. Without Scott's tenant details as described in Section 3.1(e)(1) of the [l]ease, Rein's architects were unable to prepare the Plan which was a necessary step prior to construction of the actual building. Then in 1990, Scott expressed its interest in converting the Big Wheel Store, in lieu of constructing a new building. Scott's participation in the Big Wheel Store conversion project through January 18, 1991, continued to promote the delay in constructing the grocery store as described in the [l]ease. Additionally,

there is evidence that in November of 1990, prior to the breach of the [l]ease, Scott had entered into sales negotiations with Super Valu Stores, Inc. which already had two grocery stores in the Warsaw area. Thus, it can be inferred that Scott decided that it was not in its best interest to lease a store in Warsaw. Scott could not willingly participate in a delay of performance and then declare the [l]ease rescinded because of delay; reasonable notice had to be given to Rein, along with an opportunity to perform within a reasonable time.

*Id.* at 104.

Landlords and Hoosier vigorously debate whether *Scott–Reitz* is dispositive of this issue. Landlords correctly note that "the lease in *Scott–Reitz,* unlike the Lease here, contained an express provision compelling the tenant to give notice of default and an opportunity to cure for any default of the [l]andlord." Appellants' Reply Br. at 7 (citation, quotation marks, and emphasis omitted). In advancing this argument, however, Landlords ignore the fact that the *Scott–Reitz* court specifically stated that it would reach the same result even if there had not been an express provision in the lease based solely on the common law. Thus, if we determine that the common law principles set forth in *Scott–Reitz* are applicable to the facts here, then there is certainly no barrier to disposing of this issue based on those principles.

Landlords also assert that *Scott–Reitz* is inapposite because the tenant there "intentionally and actively engaged in a pattern of conduct that deliberately postponed the construction project and prevented the landlord from timely performing its obligations under the lease." *Id.* In contrast, according to Landlords, there is no evidence that they engaged in a deliberate course of conduct to prevent USH from

making monthly rental payments. We think, however, that the undisputed evidence shows that Landlords engaged in a deliberate course of conduct in which they acquiesced to, or even promoted, a delay in the payment of rent.

Here, the trial court found, and the parties do not dispute, the following facts. Landlords are owned directly or indirectly by various members of the Turner family, including Paul Turner, Paul Eric Turner ("Eric"), Kyle Turner, and Paul Ezekiel Turner ("Zeke"). Appellants' App. at 10. Hoosier is owned by Stuart Reed. The Turners and Bartle have been in the business of developing and operating nursing homes and similar businesses across Indiana for many years. In recent years "there was a 'falling out' between the Turners and Bartle related to other projects and business dealings that are not the subject of this action." *Id.* at 13. Following the last payment of rent under the Lease, the Turners and Bartle continued to do business with each other on various projects. From September 2006 to the filing of the complaint in February 2008, Eric, Zeke, and Bartle held periodic discussions and meetings, during which the nonpayment of rent under the Lease was discussed. "Apparently, allegations were made on both sides of the discussion about non compliance with business obligations in this and other projects[.]" *Id.* at 13–14.

Our review of the record shows that in June or July of 2006, shortly after Rynard assigned its rights and obligations under the Lease to Landlords, Landlords and USH experienced significant issues under the Lease, which gave rise to numerous discussions between them. *Id.* at 514, 530–31. The parties agree that USH stopped making rent payments in September 2006. On the other hand, as of January 2008, USH had advanced hundreds of thousands of dollars to the Turners' operation in Batesville, Indiana. USH–Bartle's Appellees' App. at 1–7. Landlords do not dispute this. Apparently, the parties were negotiating a possible setoff of the amounts due and owing at Batesville with the amounts due and owing under the Lease. *Id.* at 14. Also, Reed met with the Turners regarding the rent due under the Lease, the money the Turners owed to USH for the Batesville operation, and the possibility of his exercise of the option in his sublease to purchase Grandview. Appellants' App. at 517–18, 572, 577–79, 582. As of the last meeting between Reed and Eric, Eric agreed to provide an accounting of what USH owed to the Turners' companies under the Lease so that it could be compared with the amount they owed to USH with respect to their Batesville operation. *Id.* at 579–581. Landlords do not dispute this. Thus, for a year and a half, the parties were actively negotiating significant issues directly related to the Lease and various agreements involving other properties, and the rent due under the Lease was only one factor in these negotiations. During this time, Landlords refrained from pursuing their remedies under the Lease to enforce the payment of rent.[12] In fact, in *Scott–Reitz*, the trial

---

12. Landlords argue that they never deviated from requiring strict performance under the Lease. They point to an email sent by Eric to Bartle demanding that rent due under the Lease be paid. Appellants' Reply Br. at 8; Appellants' App. at 594. We find this email entirely unavailing, as it is dated June 19, 2006, *before* USH stopped making rent payments. In addition, Landlords direct our attention to testimony regarding numerous communications between the parties, in which the nonpayment of rent was discussed. Even if the nonpayment of rent was discussed in these meetings, Landlords do not dispute that they were holding meetings that also included discussions regarding the amounts Landlords owed USH with the possibility of a setoff as well as negotiations to sell Grand-

court found that as of the date Scott repudiated the lease, Rein was "ready, willing, and able to resume its activities in preparing for the construction of the grocery store called for in the [l]ease." 658 N.E.2d at 103. Likewise, here, on January 3, 2008, (approximately two weeks before Landlords filed their complaint) Reed specifically informed Eric that he was willing to "step in and cure [the nonpayment of rent under the Lease]." Appellants' App. at 586.

Thus, Landlords' course of conduct in actively negotiating with Bartle and Reed for an alternative solution for one and a half years demonstrates a willing delay in USH's nonpayment of rent. Based on the designated evidence, we conclude that both parties acquiesced to a delay in the payment of rent, and therefore neither side can suddenly declare the contract terminated and "simply walk away." *Scott–Reitz*, 658 N.E.2d at 104. Instead, Landlords were required to give reasonable notice to USH with an opportunity to perform within a reasonable amount of time before taking action to terminate the Lease.

■ Finally, Landlords assert that section 10.5 of the Lease precludes Landlords' acquiescence to the delay in the payment of rent from constituting a waiver of their rights under the Lease. That section provides that no failure of Landlords to insist upon strict performance shall be construed as a waiver and that any waiver by Landlords of any provision must be expressed in writing. Appellants' App. at 73. Landlords interpret Hoosier's common law argument as one of waiver. "Waiver is an intentional relinquishment of a known

right involving both knowledge of the existence of the right and the intention to relinquish it." *van de Leuv v. Methodist Hosp. of Ind., Inc.,* 642 N.E.2d 531, 533 (Ind.Ct.App.1994).

■ However, we think that estoppel is a more appropriate characterization. The estoppel doctrine is based on the rationale that one who by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other. 31 C.J.S. ESTOPPEL AND WAIVER § 1 (2008). Our supreme court has stated, "Estoppel is a judicial doctrine sounding in equity. Although variously defined, it is a concept by which one's own acts or conduct prevents the claiming of a right to the detriment of another party who was entitled to and did rely on the conduct." *Brown v. Branch,* 758 N.E.2d 48, 51–52 (Ind.2001).

Our resolution of this issue is based on the principle of estoppel not waiver, and therefore section 10.5 is inapplicable to the circumstances.[13] Specifically, we have concluded that Landlords' conduct during the one-and-a-half years between the last rent payment and the filing of their complaint demonstrates their acquiescence to the delay of rent payments and that therefore they are estopped from suddenly, without notice, and without a reasonable time to cure, claiming that USH breached the Lease by failing to make rent payments. Accordingly, based on the foregoing, we conclude that USH was entitled to notice and an opportunity to cure, and therefore the filing of the Landlords' complaint was premature and did not terminate the Lease. *See Catt,* 779 N.E.2d at 3 (noting

---

view to Reed pursuant to his option to purchase.

**13.** We also observe that "[a] right of forfeiture for breach of a condition, is, in effect, waived

if the lessor does not avail himself or herself of the right *or if there is an unreasonable delay in enforcement."* 52 C.J.S. LANDLORD AND TENANT § 185 (2003) (emphasis added).

that we may affirm a trial court's ruling on a summary judgment motion on any grounds supported by the record). Therefore, we affirm the trial court's denial of Landlords' summary judgment motion on this issue and its grant of Hoosier's First Motion on this issue.

## II. Compound Interest

In the Prejudgment Possession Ruling, the trial court made a preliminary calculation of rent and late charges owed by USH to Landlords of $741,987.47. The trial court used a five percent interest rate, compounded, to calculate the total due Landlords based on paragraph 10.4 of the Lease, which provides, "Tenant shall pay to Landlord ... a late charge equal to five percent (5%) of the amount of all installments of Rent not paid on the due date." Appellants' App. at 15, 72. However, in making this calculation the trial court stated,

This is not to be considered as a final judgment, *res judicata*, or in any other way a final determination of damages that may be owed to the [Landlords] or the [Appellees], as the Landlord[s] or the [Appellees] may also be entitled to collect attorney fees and litigation costs as well as actual damages proven under the [Landlords'] Complaint, or proven under any potential counterclaims that may be filed by the [Appellees].

*Id.* at 15.

Also relevant is the trial court's statement in the "Factual Background" section of the Ruling, which provides as follows:

USH and [Hoosier] complied with the Court's [Prejudgment Possession Ruling] and have apparently made all monthly payments to date as required ... and continue to operate Grandview as a nursing facility. [Landlords] still assert that the Court's calculation of rent and late fees is erroneous, and that more payments and late fees are owed

to [them]. USH and [Hoosier] still assert that the Court's calculation of rent and late fees is erroneous, and that less money is owed to [Landlords].

*Id.* at 17.

Regarding USH and Bartle's motion for summary judgment, the Ruling provides:

Although USH and Bartle claim that [Appellees'] compliance with the Court's [Prejudgment Possession Ruling] "cured" any default of the [L]ease, the Court finds that a genuine and material issue of fact exists as to the correct amount of back rent, late fees, attorney fees and costs that the [Appellees] may owe to the [Landlords]. **RULING: Summary judgment as to this issue is denied.**

*Id.* at 23. As to Hoosier's Second Motion, the trial court noted, "the exact amount owed to [Landlords] in rent, late fees and other costs under the terms of the lease agreement are genuine and material facts in issue, yet to be determined." *Id.* at 29. The trial court denied Hoosier's Second Motion "insofar as any determination of law by the Court that ... [Hoosier] is or is not entitled to 'overpayments' to [Landlords]." *Id.*

 Appellees contend that the trial court erred in compounding late charges, which resulted in Landlords being overpaid. Landlords argue that because the Prejudgment Possession Ruling is an interlocutory order for the payment of money, it is an interlocutory appeal of right, and therefore Appellees had to bring such appeal within thirty days of the ruling. *See* Ind. Appellate Rule 14(A) (providing that interlocutory orders for payment of money are appealable as a matter of right by filing notice of appeal within thirty days of entry of interlocutory order). Having failed to do so, Landlords assert, Appellees must wait until after the final judgment on

damages is entered to present the matter of compound charges for appellate review. We agree.

■ We observe that "even though an interlocutory order may be appealable as of right under Appellate Rule 14(A)[ ], there is no requirement that an interlocutory appeal be taken. A claimed error in an interlocutory order is not waived for failure to take an interlocutory appeal but may be raised on appeal *from the final judgment.'* " *Bojrab v. Bojrab,* 810 N.E.2d 1008, 1014 (Ind.2004) (emphasis added) (citation omitted). Our supreme court has explained,

> [A] final judgment disposes of all issues as to all parties thereby ending the particular case. It leaves nothing for future determination. This doctrine is now formalized in Indiana Rule of Appellate Procedure 2(H), which provides that a judgment is final if, "(1) it disposes of all claims as to all parties...." Ind. Appellate Rule 2(H).

*Georgos v. Jackson,* 790 N.E.2d 448, 451 (Ind.2003) (some citations and quotation marks omitted).

Indiana Appellate Rule 2(H) also provides that a judgment is a final judgment if

> the trial court in writing expressly determines under Trial Rule 54(B) or Trial Rule 56(C) that there is no just reason for delay and in writing expressly directs the entry of judgment (i) under Trial Rule 54(B) as to fewer than all the claims or parties, or (ii) under Trial Rule 56(C) as to fewer than all the issues, claims or parties[.]

Here, although the Ruling contains the relevant language from Indiana Trial Rules 54(B) and 56(C), we do not think that the Ruling is "a final judgment" for purposes of appealing a previous interlocutory appeal of right because the Ruling "did not end the case." *Georgos,* 790 N.E.2d at 451. Having failed to appeal the Prejudgment Possession Ruling within thirty days, Appellees must now wait until the final judgment, i.e., the one that "leaves nothing for future determination," is entered. *Id.*[14]

Simply put, we agree with Landlords that there has been no final determination of late charges for this Court to consider on appeal. Based on the trial court's

**14.** We observe that there may be instances in which a cross-appeal from a prior interlocutory order may be appropriate. In *Murray v. City of Lawrenceburg,* 903 N.E.2d 93 (Ind.Ct. App.2009), *trans. granted,* the defendants filed a motion for judgment on the pleadings, which the trial court denied and certified for interlocutory appeal. However, we denied defendants' motion to accept interlocutory jurisdiction. Subsequently, the trial court denied plaintiffs' demand for jury trial and certified this order for interlocutory appeal. We accepted interlocutory jurisdiction over the order denying plaintiffs' request for jury trial, and defendants cross-appealed the order denying their motion for judgment on the pleadings. The plaintiffs objected to such cross-appeal, arguing that it was unrelated to their interlocutory appeal and that we had previously declined to accept interlocutory jurisdiction over the order denying defendants' motion for judgment on the pleadings. We noted that " 'in rare instances reconsideration of motions to accept or oppose discretionary interlocutory appeals may be appropriate, such as where a successive motion demonstrates good cause why the motion panel's initial ruling should be reconsidered.' " *Id.* at 100 (quoting *Bridgestone Americas Holding, Inc. v. Mayberry,* 854 N.E.2d 355, 360 (Ind.Ct. App.2006), *trans. granted, summarily aff'd in relevant part by* 878 N.E.2d 189, 191 n. 2 (Ind.2007)). We concluded that good cause had been demonstrated in that (1) we had accepted interlocutory jurisdiction to hear the appeal of the denial of plaintiffs' demand for jury trial, (2) the motion for judgment on the pleadings was potentially dispositive, and (3) judicial economy was served by consideration of both certified interlocutory orders simultaneously. *Id.* Transfer has been granted in *Murray.*

statements in the Prejudgment Possession Ruling and the Ruling itself, it appears that the trial court recognizes that all parties dispute its calculation of rent and late fees and that it has not made a final determination regarding the amount of back rent and late fees due Landlords. As such, the question of compound charges is not yet ripe for appellate review.[15]

### III. Cure of Default

 USH and Bartle in their summary judgment motion, and Hoosier in its Second Motion, argued that Hoosier's payment to Landlords pursuant to the Prejudgment Possession Ruling "cured" the default. Hoosier also argued that Landlords were overpaid and that Hoosier was entitled to that overpayment. The trial court denied both motions, finding that a genuine issue of material fact exists as to the correct amount of back rent, late fees, attorney's fees, and costs that USH may owe to Landlords. Appellants' App. at 23, 29. Given that there has not been a final determination as to these amounts, we are unpersuaded by Appellees' arguments that Hoosier's payment cured USH's default. Therefore, we affirm the trial court's denial of USH and Bartle's summary judgment motion and Hoosier's Second Motion on this issue.

### IV. Option to Purchase

In its Third Motion, Hoosier argued that Landlords breached the Lease by failing to honor the terms of the Lease's option to purchase and requested that the trial court order specific performance of its terms. Section 15 provides as follows:

15. *Option to Purchase.* So long as no Event of Default shall have occurred and be continuing, Tenant shall have the option (the "Purchase Option") to pur-

chase the Premises at any time during the Term, provided Tenant is not in default, for the Purchase Price of Two Million Five Hundred Thousand Dollars ($2,500,000) (the "Purchase Price"). The option may be exercised by Tenant on no less than ninety (90) days prior notice to Landlord, identifying the date on which closing shall occur. At closing, Landlord shall convey the Premises to Tenant by warranty deed and bill of sale. If closing does not occur by the date identified by Tenant, then Tenant shall reimburse Landlord for all costs, expenses and fees (including attorney's fees) incurred by Landlord in respect of the exercise of the option, negotiation and preparation for closing.

Appellants' App. at 75. The trial court's Ruling provides as follows:

There is no factual dispute that USH was delinquent in the payment of rent to [Landlords] prior to the filing of [Landlords'] Complaint and the issuance of the Court's [Prejudgment Possession Ruling]. The event of default, non-payment of rent, occurred. As previously noted, both [Landlords] and [Appellees] dispute the amount of rent and late fees ordered payable by USH and/or [Hoosier] to [Landlords] in the Court's [Prejudgment Possession Ruling]. Thus, a genuine and material issue of fact as to the exact amount of rent, late fees and costs owed to [Landlords] still exists, and must be resolved by agreement of the parties or by further Court hearing or trial; the event of default is "continuing" until the issue of rent, late fees and costs payable by the Tenant to [Landlords] is resolved. Until this issue is resolved, the option to purchase the real estate may not be exercised under the terms of the

---

15. Hoosier also argues that Landlords are not entitled to attorney's fees. Hoosier's Appellee's Br. at 35–36. The trial court has not issued a final ruling on attorney's fees and costs from which to appeal. Consequently, the issue is not ripe for appellate review.

lease agreement. [Hoosier's] request that the Court order [Landlords] and USH to convey the real estate is premature.

**RULING: The motion for summary judgment by [Hoosier] (and USH, Bartle, by adoption) on the issue of breach of lease by [Landlords'] refusal to transfer the real estate under the option to purchase under the present facts and circumstances, and for specific performance of the option to purchase is premature and is denied.**

*Id.* at 30–31.

Appellees argue that the trial court erred in denying the Third Motion. However, Appellees' argument rests on the acceptance of their argument that Hoosier's payment to Landlords pursuant to the Prejudgment Possession Ruling cured USH's default. We have previously rejected that argument and affirmed the trial court's finding that a genuine issue of material fact exists as to the correct amount of back rent, late fees, attorney's fees, and costs owed by USH to Landlords. We affirm the trial court's denial of Hoosier's Third Motion.

### V. Remaining Counterclaims

In this section, we address Hoosier's counterclaims against Landlords: (1) tortious interference with sublease; (2) civil violations of Indiana Code Section 35–43 *et seq.* (offenses against property); and (3) unjust enrichment and money had and received. The trial court granted Landlords' summary judgment motion on these claims. We address each in turn.

### A. Tortious Interference with Sublease

■ The trial court's Ruling provides as follows:

To prevail upon [Hoosier's] claim against [Landlords] of tortious interference with the contract (sublease) between USH and [Hoosier], [Hoosier] must prove the following elements: (1) the existence of a valid and enforceable contract; (2) [Landlords'] knowledge of the existence of the contract; (3) [Landlords'] intentional inducement of the breach of the contract; (4) the absence of justification; and (5) damages resulting from [Landlords'] wrongful inducement of the breach.

[Hoosier's] claim of tortious interference must fail, as there is absolutely no evidence that [Landlords] intentionally induced USH (sublease Landlord/master lease Tenant) to breach the sublease agreement between USH and [Hoosier] [ (sublease tenant) ]. In addition, [Hoosier] has no privity of contract with [Landlords] upon the Master Lease between [Landlords] and USH.

Appellants' App. at 32–33 (footnote with citation omitted).

Hoosier attempts to argue that the filing of the Landlords' complaint caused USH to breach the covenant of quiet enjoyment owed to Hoosier pursuant to the sublease. Although Hoosier sets forth the applicable law related to tortious interference with a contract and discusses the meaning of inducement, it fails to demonstrate how the initiation of the suit was without justification. Hoosier's Appellee's Br. at 48–50. Therefore, its argument is without merit. We affirm the trial court's judgment on this issue.

### B. Civil Violations

■ The Ruling also provides:

To recover civil damages under I.C. 34–24–[3]–1 [16] for a violation of I.C. 35–

---

**16.** Indiana Code Section 34–24–3–1 provides that a person who suffers a pecuniary loss as a result of a violation of Indiana Code Section 35–43 *et seq.,* may bring a civil action against the person who caused the loss for

43, the claimant must prove by a preponderance of the evidence all of the elements of the underlying criminal act.

To prove criminal deception, the claimant must prove that the tortfeasor knowingly or intentionally [made] a false or misleading written statement with the intent to obtain property, employment or an educational opportunity. I.C. 35-43-5-3(a)(2).

To prove criminal mischief, the claimant must prove that the tortfeasor knowingly or intentionally [caused] another to suffer pecuniary loss by deception or by an expression of intention to injure another person or to damage the property or to impair the rights of another person. I.C. 35-43-1-2(a)(2).

[Hoosier's] claim for damages under I.C. 34-24-[3]-1 must fail, as there is absolutely no evidence that [Landlords] made any false or misleading written statement to USH or [Hoosier] with the intent to obtain property from USH or [Hoosier], and there is absolutely no evidence that [Landlords] knowingly or intentionally caused USH or [Hoosier] pecuniary loss by deception or to impair the rights of another person. This is a dispute over enforcement of the Master Lease, a contract, between commercial entities, well versed in the nature, meaning and operation of commercial lease agreements. Granted, [Landlords] and [Appellees] disagree on the interpretation and meaning of the "default" and "cure" provisions of the Master Lease, and there remains a dispute as to the amount of rent, late fees and costs due and owing to [Landlords], but that alone does not elevate this dispute into the realm of actionable criminal behavior.

Appellants' App. at 33-34 (footnote with citation omitted).

Hoosier baldly asserts that "Landlords were not entitled to compound late charges yet under the penalties of perjury filed the Complaint and Turner Affidavit, thereby repeatedly making the material and deceptive misrepresentations of existing fact that the total rents owing as of the date of filing of the Complaint, including late charges, equaled $774,915.54." Hoosier's Appellee's Br. at 50. However, just because the parties disagree as to whether interest is properly compounded under the Lease does not mean that Landlords misrepresented the amount due under the Lease. We affirm the trial court's grant of Landlords' summary judgment motion on this issue.

### C. Unjust Enrichment and Money Had and Received

As to this issue, the Ruling states:

(1) An amount not to exceed three (3) times the actual damages of the person suffering the loss.
(2) The costs of the action.
(3) A reasonable attorney's fee.
(4) Actual travel expenses that are not otherwise reimbursed under subdivisions (1) through (3) and are incurred by the person suffering loss to:
(A) have the person suffering loss or an employee or agent of that person file papers and attend court proceedings related to the recovery of a judgment under this chapter; or
(B) provide witnesses to testify in court proceedings related to the recovery of a judgment under this chapter.

(5) A reasonable amount to compensate the person suffering loss for time used to:
(A) file papers and attend court proceedings related to the recovery of a judgment under this chapter; or
(B) travel to and from activities described in clause (A).
(6) Actual direct and indirect expenses incurred by the person suffering loss to compensate employees and agents for time used to:
(A) file papers and attend court proceedings related to the recovery of a judgment under this chapter; or
(B) travel to and from activities described in clause (A).
(7) All other reasonable costs of collection.

The existence of an express contract precludes recovery on the equitable theory of money had and received. *Shelby Eng'g., Inc. v. Action Steel Supply, Inc.,* 707 N.E.2d 1026, 1028 [ (Ind.Ct.App. 1999) ]. The Master Lease in this case is an express contract between [Landlords] and USH. The sublease is an express contract between USH and [Hoosier]. Assuming *arguendo,* that [Hoosier] overpaid back rent and late fees to [Landlords] to preserve the Master Lease for USH, then [Hoosier's] claim of unjust enrichment, money had and received, and any claim for reimbursement or damages should be directed to USH, the beneficiary of such payments—not [Landlords], the Landlord entitled to rent payments under the Master Lease.

Appellants' App. at 34.

Hoosier contends that *Shelby* "absolutely authorizes recovery by Hoosier." Hoosier's Appellee's Br. at 39. We disagree.

▮▮▮▮ Initially, we observe that an action for money had and received is an equitable remedy that lies in favor of one person against another, when that other person has received money either from the plaintiff himself or third persons, under such circumstances that in equity and good conscience he ought not to retain the same, and which money, *ex aequo et bono,* belongs to the plaintiff, and where money has been received by mistake of facts, or *without consideration,* or upon a consideration that has failed, it may be recovered back. Such an action rests upon an implied promise and may be maintained against the person who received money from the plaintiff under circumstances which in equity and good conscience he should not retain.

*Pufahl v. Nat'l Bank of Logansport,* 129 Ind.App. 191, 195, 154 N.E.2d 119, 120–21 (1958) (emphasis in original).

The facts of *Shelby* are as follows:

The record shows that in the fall of 1996 Action Steel was in the market for an overhead crane when it discovered one for sale in a building occupied by Thomas Melvin. Shelby Engineering owned the building but was leasing it to Melvin who was doing business as Speedway Pallet. Shelby Engineering also owned the crane and had agreed to pay Melvin a $500.00 commission if he succeeded in selling it. Giving the impression that it was he who owned the crane, Melvin entered negotiations with Action Steel for the crane's purchase. The parties entered a written agreement that provided for a $25,000.00 purchase price with a $14,000.00 down payment. Melvin received the down payment, deposited it into his own checking account, and purchased a cashier's check for $8,000.00. The check was made payable to Shelby Engineering. He then presented the check to George Hilgemeier, the president of Shelby Engineering, indicating that it represented a down payment from a buyer who was purchasing the crane. Melvin told Hilgemeier that the purchase price was $24,000.00. When asked the name of the buyer, Melvin did not respond. Hilgemeier informed Melvin that he wanted a written agreement from the party wishing to buy the crane along with proof of the buyer's insurance. When three weeks had passed and Melvin still had not provided the written agreement or the name of the buyer, Hilgemeier wrote a letter to Melvin indicating the crane was no longer for sale. The letter again requested the name of the buyer so that the $8,000.00 could be refunded. In response Melvin produced a fictitious bill of sale that included the name of a ficti-

tious buyer along with a fictitious address. When Shelby Engineering was unable to contact the fictitious person it eventually concluded that no such person existed. Thereafter, Action Steel discovered that Shelby Engineering was the true owner of the crane. Hilgemeier and a representative of Action Steel then tried to negotiate a deal but could not reach an agreement. During the failed negotiations Hilgemeier acknowledged that the $8,000.00 belonged to Action Steel. However even after a demand, Shelby Engineering refused to return the money. Action Steel then filed suit against Shelby Engineering on various theories of liability including unjust enrichment and money had and received.

707 N.E.2d at 1027. The trial court entered judgment in Action Steel's favor, and Shelby appealed, arguing that the theory of money had and received did not apply where a transaction is based on an express contract. The *Shelby* court reached the following conclusion:

There is no question that the existence of an express contract precludes recovery on the equitable theory of money had and received. In this case however there was no contract between Shelby Engineering and Action Steel. Rather, the contract existed between Shelby Engineering and Melvin. Although Melvin may not have been able to pursue against Shelby Engineering the equitable remedy of money had and received, there is no such prohibition pertaining to Action Steel.

In this case the record is clear that Shelby Engineering received from a third person money belonging to Action Steel. The money was provided for the purchase of Shelby Engineering's crane. Shelby Engineering acknowledged the money belonged to Action Steel but refused to return the money even after the parties could not reach agreement on the crane. The consideration failed and under the circumstances in equity and good [conscience] Shelby Engineering should not retain the money.

*Id.* at 1028 (citation omitted).

■ *Shelby* does not support Hoosier's argument. Here, Landlords and USH are parties to the Lease, and USH and Hoosier are parties to the corresponding sublease. Section 40 of the sublease expressly provides that

[i]f, at any time during the Term, Tenant shall have been advised by Master Landlord that Landlord is in default under the terms of the Master Lease, Tenant may, but shall not be required to, pay to Master Landlord Rent and any other amounts due Landlord hereunder. In such event, all amounts so paid to Master Landlord by Tenant shall be credited to Tenant hereunder as if such payments had been made to Landlord.

Appellants' App. at 160. Therefore, the existence of an express contract precludes recovery under the theory of money had and received. Likewise, the existence of an express contract precludes recovery under the theory of unjust enrichment. *See City of Indianapolis v. Twin Lakes Enterprises, Inc.*, 568 N.E.2d 1073, 1079 (Ind.Ct. App.1991) (stating that where there is an express contract, failure to perform does not give rise to action for unjust enrichment), *trans. denied.*[17] Accordingly, we

17. We have explained that

Unjust enrichment comes within the purview of an action based on quasi contract and becomes an [indispensable] indispensible element thereof. Generally, the plaintiff must show the benefit was rendered to the party sought to be charged at his implied request under circumstance in which a court of equity invokes the remedy of restitution in order to avoid unjust enrichment.

affirm the trial court's grant of summary judgment to Landlords on these issues.[18]

Affirmed.

BRADFORD, J., and BROWN, J., concur.

Therefore, quasi contract is designed to remedy a wrong, and relevant considerations include whether the defendant is [u]njustly enriched and whether the benefits were bestowed at his implied request. Absent a wrong, intervention by equity is inappropriate.

*Indianapolis Raceway Park, Inc. v. Curtiss*, 179 Ind.App. 557, 560, 386 N.E.2d 724, 726 (1979) (citations, quotation marks, and footnote omitted).

18. Further, we observe that the Prejudgment Possession Ruling specifically provides,

Any payments made by [Hoosier] to [Landlords] under the terms of [this order] shall be setoff to any rent payments owed by [Hoosier] to USH under the sub-lease to the extent that [Hoosier's] payments to [Landlords] equal or exceed the amount or rent payable to USH under the terms of the sub-lease.

Appellants' App. at 16.